Isiah **FUGETT**, Appellant,

v.

**COMMONWEALTH of Kentucky,**
**Appellee.**

**No. 2006–SC–000051–MR.**

Supreme Court of Kentucky.

April 24, 2008.

Daniel T. Goyette, Louisville Metro Public Defender, Frank William Heft, Jr., Elizabeth B. McMahon, Office of the Jefferson District Public Defender, Louisville, KY, Counsel for Appellant.

Jack Conway, Attorney General, James C. Shackelford, Assistant Attorney General, Office of Criminal Appeals, Attorney General's Office, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice SCOTT.

## I. Introduction

Isiah Fugett was convicted of two counts of Manslaughter in the Second Degree, Kentucky Revised Statute (KRS) 507.040, and one count of Tampering with Physical Evidence. KRS 524.100. By agreement with the Commonwealth, Fugett was sentenced to thirty (30) years in prison. Appealing to this Court as a matter of right, Kentucky Constitution § 110(2)(b), Fugett argues the circuit court erred by: (1) failing to comply with the administrative procedures governing jury selection; (2) denying his *Batson* challenge; (3) denying his juror challenges for cause; (4) denying his motion to suppress his statements; and (5) admonishing the jury to disregard evidence that the victims had previously admitted to being in possession of a stolen 9mm pistol. Finding error, regarding a juror challenge for cause, we must reverse for a new trial.

## II. Factual Background

On January 26, 2004, Eric Ray and Robert Robbins went to a downtown Louisville Chevron station looking for marijuana. Fugett met with Robbins and agreed he would get the marijuana and call with arrangements for the sale. Around 10:30 p.m., Fugett got Dalisha Fields to drive him. He borrowed her cell phone and confirmed that Robbins would meet him across from the Chevron in the parking lot of the Clarion Hotel. Fields then drove

Fugett to the Clarion Hotel and parked near a van.

Shortly, a black Lincoln Navigator pulled in beside them and Fugett got into the rear seat of the Navigator. A short time later, Fugett returned to Fields' car with a shotgun. He informed Fields that he shot the boys when one pulled the shotgun on him. He then told her to drive to her apartment.

As she drove, Fugett wiped the blood off the shotgun. At her apartment, Fugett gave her the shotgun and a 9mm pistol to hide. Later, police contacted Fields and she admitted she had hidden the weapons at Fugett's request and had driven him to the Clarion Hotel. Both weapons were recovered.

Eric Ray's body was found partially underneath the passenger side of the vehicle. His wounds were consistent with being shot once from the back, once from behind while falling from the vehicle, and once while on the ground. Robert Robbins, who was lying fifteen feet from the vehicle, was alive when officers arrived. His wounds were consistent with being shot while running from the vehicle. He died at the hospital.

A patron at the hotel had heard the shots and observed Robbins being shot as he ran. A clerk at the Chevron, Jeffery Johnson, knew the victims and said he had seen them on the evening of the shooting talking with an African–American known as Bosco. "Bosco" was an alias used by Fugett.

They further learned that Fugett was being released from jail on an unrelated marijuana charge. When later approached by detectives, Fugett agreed to accompany them to headquarters to answer questions.

During the initial portion of the interview, Fugett led the officers to believe he had information and would be willing to assist in the investigation. However, in the early morning hours of January 28th, he approached a detective and indicated for the first time that he may have had a role in the incident. Thus, when the detectives returned at 5:50 a.m., Fugett was given his *Miranda* warnings. After executing a waiver, Fugett informed the officers he had been present at the shootings. While he denied pulling the trigger, he admitted he had hidden the guns. He was then arrested. Around 10:30 a.m., he again approached the officers and said he had shot the victims in self-defense using a pistol he had taken from Ray's pocket.

## III. Analysis

### A. Jury Selection

Fugett first argues the method of jury selection in Jefferson County violated his right to a jury pool made up of a fair cross section of the community. He points out that of the 700 summonses sent out, 328 [1] were unaccounted for. Fugett argues that under Part II, § 6 of the Administrative Procedures of the Court, the court was required to have the sheriff personally serve a summons on each of the 328 jurors. Instead, the circuit court relied on KRS 29A.060(4), which leaves it to the court's discretion as to whether the jurors are to be personally served. Citing to Kentucky Rules of Criminal Procedure (RCr) 1.02, Fugett argues the court erred in holding that the statute controls.

In accordance with the procedures of the Jefferson Circuit Court, a summons was issued by mail along with a qualification form, however, the prospective jurors

---

1. Fugett's brief, in footnote 1, acknowledges that the parties agreed two prospective jurors should be excused. However, Fugett subsequently counts these two along with the 132 not accounted for, leaving a total of 134.

were directed to return the qualification form only if they felt they were disqualified, were seeking a postponement, or believed they should be excused. If the form was not returned, the prospective juror was expected to appear. In Fugett's case, 196 of the 700 issued were returned as non-deliverable. Another 132 failed to respond or appear.[2]

Therefore, the court rejected Fugett's motions to have the unresponsive jurors personally served, leaving 150 prospective jurors available to hear his case. Of these, two were excused by agreement of the parties. The remaining 148 had to then be randomly reduced to 125 to meet the fire code limitations imposed on the circuit courtrooms in Jefferson County. The remainder was available for jury service, if selected, in his case.

Under § 116 of the Kentucky Constitution, this Court has the authority to prescribe the rules governing procedures before Kentucky courts. Part II, § 6 of the Administrative Procedures of the Court states in pertinent part, that "[i]f the summons is served by mail, any prospective juror who does not return the juror qualification form within ten (10) days ... shall be personally served by the sheriff." Further, RCr 1.02(2) states that "[t]o the extent that they are not inconsistent with these Rules, the regulations, administrative procedures, and the manuals published by the Administrative Office of the Courts ... shall have the same effect as if incorporated in the Rules." Thus, the procedures adopted by the rules of this Court require that the summons be personally served. This is in conflict with KRS 29A.060(4), which states that "[i]f the summons is served by mail, any prospective juror who does not return the juror qualification form within ten (10) days *may* be personally served by the sheriff at the discretion of the Chief Circuit Judge[.]" (Emphasis added).

Fugett argues that since the statute deals with rules of practice or procedure before the court, it violates the separation of powers doctrine set out in § 28 of the Kentucky Constitution. In light of the differences between § 6 and KRS 29A.060(4), we are forced to conclude that a conflict does exist. However, this conclusion does not mandate a finding that the circuit court erred in relying on KRS 29A.060(4) for reasons that we may consider questions of comity.

As noted in *Taylor v. Commonwealth,* 175 S.W.3d 68, 77 (Ky.2005), comity "means the judicial adoption of a rule unconstitutionally enacted by the legislature not as a matter of obligation[,] but out of deference and respect." We went on to say that "for a statute to be extended comity this Court must find that such a statute is a statutorily acceptable substitute for current judicially mandated procedures or can be tolerated in a spirit of comity because it does not unreasonably interfere with the orderly functioning of the courts." *Id.* at 77 (Internal quotes and citations omitted). "The decision to extend comity to a statute otherwise unconstitutional because it violates the separation of powers doctrine is one of institutional policy reserved for the Supreme

2. For those who fail to respond or appear, the chief circuit judge sends out letters informing the prospective jurors of the importance of responding, and that they are subject to contempt should they continue to ignore the summons. The majority of those who receive the letter respond with an explanation. The chief circuit judge then reviews the responses and takes appropriate action (i.e. assigning the prospective juror to a later pool, granting a postponement, or excusing the person). For the remaining prospective jurors who fail to respond, the court issues a second summons.

Court only." *Foster v. Overstreet,* 905 S.W.2d 504, 507 (Ky.1995).

▮ Here, comity and common sense dictate that we accept the application of KRS 29A.060(4). Under the statute, the court is left with the discretion to utilize the personal summons as it deems necessary. As the statute grants broader discretion to the court, we cannot say it hampers or unreasonably interferes with the administration of justice.

▮ Further, this broader discretion is appropriate in places like Jefferson County, where the size limitations of the courtrooms mandate that jury pools be no larger then a certain number. Thus, even if personal service had been used to bring in more than 150 jurors, the number would still have been reduced to 125 based on limitations under its fire code. Finally, we note Fugett did not show that any portion of the county, or a specific class, was excluded from the pool. Under these circumstances, we cannot say the court erred in applying KRS 29A.060(4). Nor can we say Fugett was denied a jury pool made up of a fair cross section of the community.[3]

## B. Establishing a *Batson* Challenge

▮ Fugett next argues the Commonwealth impermissibly used two of its peremptory challenges against African–American jurors. While acknowledging the Commonwealth offered race-neutral reasons, he argues those reasons do not withstand scrutiny. Fugett asserts that two jurors were treated differently from similarly situated jurors. Thus, he argues the court erred in rejecting his *Batson* challenge.

---

**3.** In granting comity to KRS 29A.060(4), we must reject Fugett's claim that the court's reliance on the statute was in error. Further, as we find no error in the procedures used by

▮ "Challenging prospective jurors on the basis of race violates the Equal Protection Clause." *Washington v. Commonwealth,* 34 S.W.3d 376, 378–79 (Ky. 2000). Therefore, an objection to the use of peremptory challenges on this ground is evaluated under a three-step process set out in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Citing to *Batson,* this Court in *Washington* described the process, as follows:

> First, the defendant must make a prima facie showing of racial bias for the peremptory challenge. Second, if the requisite showing has been made, the burden shifts to the Commonwealth to articulate "clear and reasonably specific" race-neutral reasons for its use of a peremptory challenge. " 'While the reasons need not rise to the level justifying a challenge for cause,' self-serving explanations based on intuition or disclaimers of discriminatory motive" are insufficient. *Stanford v. Commonwealth,* 793 S.W.2d 112, 114 (Ky.1990) (quoting *Batson, supra,* at 98, 106 S.Ct. at 1724.) Finally, the trial court has the duty to evaluate the credibility of the proffered reasons and determine if the defendant has established purposeful discrimination.

*Washington,* 34 S.W.3d at 379.

Applying the three-step process set out in *Batson,* the trial court concluded that Fugett, an African–American, had established a prima facie case by showing the Commonwealth had exercised four of its nine peremptory challenges against African–American jurors. On the other hand, we note that the fourteen-person panel that heard Fugett's case included three African–American jurors. Fugett's chal-

---

the Jefferson Circuit Court in selecting the jury pool, Fugett's argument that the process involves a substantial deviation is now moot.

lenge, however, focuses on only two of the four African–American jurors struck by the Commonwealth.

As a consequence of the objection, the Commonwealth was required to articulate clear and reasonably specific race-neutral reasons for its use of the peremptory challenges. As to Juror 116572, the Commonwealth noted that the juror believed African–Americans were discriminated against by the system, that whites had too much political power, and that the death penalty should not be used for population control. The juror also noted that his own research had shown only one white person had ever received the death penalty for killing an African–American.

As to Juror 125118, the Commonwealth pointed out that the juror had described in detail a very negative experience with police. Juror 125118 had expressed the belief that African–Americans were unfairly treated by the system, that they were more likely to be charged, and that the system seemed to impose more time for marijuana offenses than murder.

In response, Fugett argued the jurors were being treated differently from similarly situated white jurors. Fugett noted that several white jurors admitted to having negative experiences with police. Fugett also argued that Juror 116572's answers concerning historical discrimination and the use of the death penalty as population control were taken out of context.

Having heard both arguments, the court concluded the Commonwealth had proffered race-neutral reasons. The court specifically noted that the Commonwealth was free to consider the totality of the juror's responses. The court further noted that the responses could be interpreted as out-spoken beliefs. Finally, the court noted that three African–Americans were on the panel. Of significance to the court was the fact that these jurors had shared views of discrimination, yet had not been so extreme or out-spoken. These circumstances led the court to conclude the Commonwealth was looking at individual jurors, and not simply acting on racially-impermissible grounds.

The record thus supports our conclusion that the three-step process was applied properly and the court complied with its duty in evaluating the reasons offered. Under these circumstances, we cannot say the court erred in rejecting Fugett's *Batson* challenge.

## C. Motions to Strike a Juror For Cause

Fugett's third argument concerns the circuit court's decision to deny his motions to strike Jurors 119631 and 123804 for cause. The record established that he used all nine (9) of his peremptory challenges. Moreover, Appellant argues that, since he was forced to remove Jurors 119631 and 123804 with his peremptory challenges, when they should have been stricken for cause, he was denied a substantial right and tool necessary to selection of an impartial jury, as well as the right to an impartial jury.

In Kentucky, the right to an impartial jury is protected by § 11 of the Kentucky Constitution, as well as the Sixth and Fourteenth Amendments to the U.S. Constitution. *See Fugate v. Commonwealth,* 993 S.W.2d 931, 939 (Ky.1999). Under RCr 9.36(1), a juror shall be excused for cause "[w]hen there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence[.]"

■ Fugett, however, made no attempt to show that the jury that heard his case was, in fact, impartial. Instead, he argues we should reverse our position in *Morgan v. Commonwealth,* 189 S.W.3d 99 (Ky.

2006), *overruled by Shane v. Commonwealth,* 243 S.W.3d 336 (Ky.2007), and return to the standard set out in *Thomas v. Commonwealth,* 864 S.W.2d 252 (Ky. 1993).[4] This we did, in our recent opinion of *Shane v. Commonwealth,* 243 S.W.3d 336 (Ky.2007). Thus, if a court abuses its discretion in denying a challenge for cause and the party had to use a peremptory challenge to strike the juror and, in fact, used all his peremptory challenges, it is reversible error. *See Stopher v. Commonwealth,* 57 S.W.3d 787, 796 (Ky.2001). As Fugett used all of his peremptory challenges, we are left to decide if the court abused its discretion in denying his challenges for cause as to either Juror 119631 or Juror 123804.

■■■■ Kentucky has long recognized that "a determination as to whether to exclude a juror for cause lies within the sound discretion of the trial court, and unless the action of the trial court is an abuse of discretion or is clearly erroneous, an appellate court will not reverse the trial court's determination." *Pendleton v. Commonwealth,* 83 S.W.3d 522, 527 (Ky.2002) (internal quotes and citations omitted). *See also Soto v. Commonwealth,* 139 S.W.3d 827, 848 (Ky.2004) ("A determination whether to excuse a juror for cause lies within the sound discretion of the trial court and is reviewed only for a clear abuse of discretion."). However, the decision to exclude a juror for cause is based on the totality of the circumstances, not on a response to any one question. *See Morgan v. Commonwealth,* 189 S.W.3d at 104, *overruled in part on other grounds by Shane v. Commonwealth,* 243 S.W.3d 336 (Ky.2007). This recognizes the duty of the trial court "to evaluate the answers of

prospective jurors in context and in light of the juror's knowledge of the facts and understanding of the law." *Stopher,* 57 S.W.3d at 797.

■■■■ This having been said, "[t]he test for determining whether a juror should be stricken for cause is 'whether ... the prospective juror can conform his views to the requirements of the law and render a fair and impartial verdict.' " *Thompson v. Commonwealth,* 147 S.W.3d 22, 51 (Ky.2004) (*quoting Mabe v. Commonwealth,* 884 S.W.2d 668, 671 (Ky. 1994)). As such, "[t]he court must weigh the probability of bias or prejudice based on the entirety of the juror's responses and demeanor. There is no 'magic question' that can rehabilitate a juror as impartiality is not a technical question but a state of mind." *Shane,* 243 S.W.3d at 338.

■■■ During voir dire, Juror 119631 stated that his wife's second cousin, a former Louisville police officer, Mackenzie Mattingly, was on duty when he shot and killed a drug suspect. Mattingly was subsequently charged and acquitted of murder. While he did not believe his relationship with Mattingly would factor into his jury service, he acknowledged that he would probably give more weight or greater credibility to the testimony of a police officer, simply because he was a police officer. He felt firmly about his belief that the police have greater credibility in their testimony and it would not depend on which officer testified; he simply felt police have more credibility than other witnesses.

Juror 119631 also presented a problem in considering mitigating evidence in the penalty phase, stating his belief that pun-

---

4. Fugett also raised the issue of retroactive application of *Morgan* to his pre-*Morgan* trial, arguing an *"Ex Post Facto"* violation of Article I, Section 10 of the United States Consti-

tution and Section 19 of the Kentucky Constitution. We do not address this argument, since it is now moot.

ishment should be based only on what occurred on the day of the killing, rather than consideration of a person's past. He did not believe that a person's use, or abuse, of alcohol should have any effect on his actions, and so those factors should not be considered. Moreover, he believed that only a person's history of violence should be considered on the issue of punishment. When asked by the prosecution as to whether he would, in his sentencing decision, consider factors like a defendant's age, IQ, or the kind of home in which he was raised, he responded that he could consider age, if the person were 10, 11, or 12 years of age. Moreover, he stated in general he could consider other factors, but they would not have much effect on his opinion.

Thereafter, he was informed by the court that if the defendant were convicted, there would be a penalty phase in which the Commonwealth would put on evidence of aggravation to obtain a sentence at the high end of the sentencing range and the defense could introduce mitigating evidence such as a defendant's age, IQ, home life as a child, and drug or substance abuse by him or his parents. The court then stated:

> The question is, is there any of that evidence that's described as mitigators that wouldn't have any bearing with you in setting a penalty? Because some people say I can consider all of that evidence and some people say well no in my view that's not proper. And again we're past the guilty and not guilty. We are at the penalty phase. So the question is, is it evidence that you would consider or is it evidence that you wouldn't consider?

Juror 119631 then stated, "I would consider it." The court then denied Appellant's motion to strike Juror 119631 for cause.

In *Stopher*, this Court found no error in the trial court's refusal to strike a juror for cause when his father had been a police officer. There we found the juror "did not have any preference for police officers and ... his family connection to the law enforcement profession would in no manner affect his ability to decide the case based on the evidence presented." *Stopher*, 57 S.W.3d at 797. In *Soto*, the juror "stated that he might give 'slightly' more weight to the testimony of a police officer than to that of a lay person. He also stated that he could render a fair and impartial decision concerning all the facts of the case, including the entire range of penalties and mitigating circumstances." *Soto*, 139 S.W.3d at 850. In *Soto*, we ruled that the response of the juror "did not establish implied bias" against the defendant based, in part, on there having been no testimonial inconsistencies between the officer's testimony and that of the lay witnesses. *Id.* Also in *Sholler v. Commonwealth*, 969 S.W.2d 706, 709 (Ky.1998), we ruled that it was not an abuse of discretion in failing to strike a juror who was a Secret Service Agent, because he "did not indicate a bias against defendants," although he "would tend to give credence to the testimony of a police officer." *Id.* This notwithstanding, when questioned by the defense, the juror admitted he was very pro-law enforcement and placed substantial credence in police officers. When asked if he thought all law enforcement officers told the truth, he replied, "I don't know, I think so, yeah, I've never experienced one who lied in court." *Id.* at 708.

We recently revisited this issue in *Shane*, where the juror in question, a Louisville Metro Police Officer, stated his association with police officers would not affect his ability to be an impartial juror, but then went on to say:

> he had "an inside point of view"; that he was "absolutely" pro-police; that while

"police are just like everybody else," he did not believe they would lie under oath because they took the oath more seriously; and that he would find it more likely that a police officer was telling the truth than a lay witness.

*Shane,* 243 S.W.3d at 337. As a result, we held:

Here, Juror 138's responses in their entirety indicated a probability that he could not enter the trial giving both sides a level playing field. His statement that he was "absolutely" pro-police and that he did not believe an officer would lie under oath clearly indicated that a defendant would have little or no chance of challenging an officer's testimony in this juror's mind.

*Id.* at 338.

Considering *Shane, Stopher, Soto,* and *Sholler* together, they support the conclusion that Juror 119631 should have been stricken for cause in this case. The statements made by the prospective jurors in *Stopher, Soto,* and *Sholler* were not as unequivocal as those made by the juror in *Shane* and Juror 119631 in this case, who indicated they would believe the testimony of a police officer, simply because he was a police officer and because police officers have greater credibility in their testimony than other witnesses. However, when contrasted directly with our finding in *Shane*—that "he did not believe that they would lie under oath because they took their oath more seriously; and that he would find it more likely that a police officer was telling the truth than a lay witness"—the factual similarity is apparent. *Shane,* 243 S.W.3d at 337.

Moreover, as to the mitigation issue, the totality of the juror's responses form a reasonable basis to conclude that he could not consider all the mitigation evidence that the law demands. He believed that only a person's history of violence should be considered on the issue of punishment and he would consider age only if the person were 10, 11, or 12 years old. He said he could consider some factors such as the defendant's IQ or the kind of home in which he was raised, but they would not have much effect on his opinion. Nor did he believe that factors such as the use, or abuse, of alcohol should be considered.

■■■ "Any juror to whom mitigating factors are . . . irrelevant should be disqualified for cause, for that juror has formed an opinion concerning the merits of the case without basis and the evidence developed at trial." *Morgan v. Illinois,* 504 U.S. 719, 739, 112 S.Ct. 2222, 2235, 119 L.Ed.2d 492, 509 (1992). Thus, heeding our recent dictates in *Shane,* designed not only to insure an impartial jury, but to ensure a "level playing field" in the selection of a jury, we must conclude that the failure to excuse Juror 119631 for cause was an abuse of discretion in this case. On its facts, we can read *Shane* no other way.

■■■ Fugett also challenged Juror 123804 for cause. Yet, during voir dire, the juror made it clear that he would consider the entire range of penalties. He indicated he would consider evidence of aggravating factors as well as mitigating factors. When asked if it was his expectation that the defendant should show the death penalty is not appropriate, the juror replied, "Yes." However, when asked by the defense if he would impose death unless the defendant showed him otherwise, Juror 123804 replied, "No."

Fugett argued that Juror 123804's answers made it clear that he would improperly impose a burden on the defense during the penalty phase. The circuit court, however, properly considered the totality of the juror's answers within the appropriate context. The court reasoned that

while Juror 123804's answers indicated that if mitigating evidence was going to be put on, it would logically be done by the defense, the court concluded that this did not indicate he was improperly imposing a burden on the defense. Further, the court noted that Juror 123804 had clearly indicated he would consider evidence of both aggravating and mitigating factors, and that he would consider the full range of penalties. Under these circumstances, the court did not err, or abuse its discretion, in denying Fugett's challenge for cause against Juror 123804.

Relying on *Shane*, however, we find the court abused its discretion in not excusing Juror 119631 for cause, and thus committed error. For reasons that such "substantial errors" are not subject to "harmless error" review, we find the error to be cause for reversal.

### D. Motion to Suppress

█ Fugett's fourth argument concerns the court's decision to deny his motion to suppress statements he made to police. Fugett asserts that from the time he was taken from the jail to headquarters for questioning, he was in custody and entitled to his *Miranda* warnings. Since no warnings were given until approximately 5:50 a.m. on the 28th, he argues his statements were obtained in violation of his right against self-incrimination. Further, Fugett argues that statements made after he was given his *Miranda* warnings were tainted and should be excluded as fruit of the poisonous tree.

█ The Fifth Amendment to the U.S. Constitution guarantees a defendant the right against self-incrimination. *See United States v. Crossley*, 224 F.3d 847, 861 (6th Cir.2000). The U.S. Supreme Court has determined that a suspect under custodial interrogation must be given notice of the right against self-incrimination,

with such notice being contained in the *Miranda* warnings. *Id., Citing Miranda v. Arizona*, 384 U.S. 436, 478–79, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). In reviewing a challenge to the denial of a motion to suppress, this Court is faced with a mixed question of law and fact. *Commonwealth v. Lucas*, 195 S.W.3d 403, 405 (Ky.2006). Findings of fact are conclusive if supported by substantial evidence. *Id. See also* RCr 9.78. However, questions of law are reviewed de novo. *Lucas*, 195 S.W.3d at 405.

Shortly after the investigation began, detectives learned that the victims had been seen shortly before the shooting at the Chevron station with a person known as Bosco. Detectives also learned that "Bosco" was an alias used by Fugett, and that he was in jail on unrelated marijuana charges. When Fugett was released from custody at approximately 11:30 p.m. on January 27th, he was met by Detectives Lawson and Seabolt who identified themselves and asked if Fugett would be willing to go to police headquarters and answer some questions. The detectives informed Fugett that he did not have to go and that he was free to leave. At approximately 11:52 p.m., Fugett agreed to accompany the detectives to police headquarters.

Fugett, without handcuffs, rode in the back of the detectives' car to headquarters. The detectives then escorted him through a non-public entrance and up a rear stairwell—a method commonly used to protect the identity of witnesses—to the offices of the Homicide Division on the second floor. Fugett, still unrestrained, was led to an interview room. Throughout his interview, Fugett was often left alone, was never restrained, and was allowed free use of the restroom, with the exception of a facility not open for public use. Fugett was also allowed to have sodas and smoke. At no time did Fugett ask that the question-

ing be stopped, nor did he indicate a desire to leave.

During the initial portion of the interview, Fugett led officers to believe he had information about the shooting and that he would assist in the investigation. He acknowledged he had been at the Chevron station and that he knew one of the victims. Further, he claimed he could identify possible witnesses, as well as a vehicle that may have been involved. As a result of Fugett's disclosures, three detectives accompanied Fugett on a drive through areas of Louisville at approximately 4:30 a.m. When they were unsuccessful, the detectives returned Fugett to the interview room to await the return of Detectives Lawson and Seabolt who had left to get food for them and Fugett.

■ While the lead detectives were out, Fugett left the interview room, approached another detective, and indicated for the first time that he had been at the scene and may have had a role in the incident. It was approximately 5:25 a.m. When the lead detectives returned at 5:50 a.m., Fugett was given his *Miranda* warnings. After executing a waiver of his rights, Fugett informed officers he had been present at the time of the shooting. While he indicated another person pulled the trigger, Fugett admitted he had agreed to hide the guns. After this disclosure, Fugett was arrested.[5]

Around 10:35 a.m., Fugett approached officers and admitted he had been the shooter. Fugett claimed that when he looked up from getting the marijuana, Ray had the shotgun aimed at him. As he and Ray struggled over the shotgun, Fugett reached into the pocket of Ray's sweatshirt, took a 9mm pistol, and shot in self-defense.

Fugett argues the approach used by the detectives in this case amounted to a question first and then warn technique which was rejected in *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). We disagree. In the *Seibert* case, police arrested Seibert as a suspect in the case. Initially, the officers intentionally questioned him without giving him his *Miranda* warnings. At the conclusion of a systematic and exhaustive interview, with little or no incriminating potential left, the officers took a short break. At the conclusion of the break, officers then gave Seibert his *Miranda* warnings without explaining that his unwarned statement could not be used against him. Referring to the original statement, officers re-interviewed Seibert on the record until all of the earlier responses were repeated. On review, the U.S. Supreme Court concluded the police strategy undermined the *Miranda* warnings. 542 U.S. at 616, 124 S.Ct. at 2612–13. The Court in *Seibert* then concluded the statements were obtained in violation of the Fifth Amendment and should have been suppressed.

The *Seibert* case is distinguishable on its facts. Fugett was not arrested as a suspect. Nor was he subjected to a systematic and exhaustive interview intended to obtain incriminating details from him. Instead, Fugett was brought in as a witness who had been with the victims at the Chevron station prior to the shooting. Further, Fugett was given the choice of whether he desired to accompany the de-

---

5. Fugett has suggested police lacked probable cause to arrest. We disagree. At the conclusion of his disclosure, police knew he had been on the scene and that he had hidden the guns. As tampering with physical evidence is a felony, we are not persuaded police lacked probable cause to arrest Fugett for his role in the incident. *See Eldred v. Commonwealth,* 906 S.W.2d 694, 705 (Ky.1994), *overruled in part on other grounds in Commonwealth v. Barroso,* 122 S.W.3d 554, 564 (Ky.2003).

tectives. The length of the initial portion of the interview was due in large part to the fact that Fugett led the officers to believe he knew information and was willing to act in concert with their efforts to solve the crime. It was not until he voluntarily approached a detective at 5:25 a.m. that officers had any idea he may have had a larger role in the incident. Then, before beginning systematic questioning, detectives properly provided him with his *Miranda* warnings. Given the distinction between this case and *Seibert*, we conclude Fugett's reliance on that case is misplaced.

 As noted in *Crossley*, notice of the right against self-incrimination must be given only when a suspect is subjected to custodial interrogation. 224 F.3d at 861. By custodial interrogation we mean "questioning initiated by law enforcement after a person has been taken into custody or otherwise deprived of freedom of action in any significant way." *Lucas*, 195 S.W.3d at 405. In *Lucas* we went on to say that "[t]he inquiry for making a custodial determination is whether the person was under formal arrest or whether there was a restraint of his freedom or whether there was a restraint on freedom of movement to the degree associated with formal arrest." *Id.* Further, "[c]ustody does not occur until police, by some form of physical force or show of authority, have restrained the liberty of an individual." *Id.* In making this determination, we must ask ourselves whether, "considering the surrounding circumstances, a reasonable person would have believed he or she was free to leave." *Id.*

Having reviewed the facts, we do not find Fugett was in custody prior to his arrest at 5:50 a.m. Previous to that time, the purpose of the questioning was to gather information from a witness who had been with the victims at the Chevron station shortly before the incident, and who

had led the officers to believe he could both identify witnesses and identify a vehicle that may have been involved. From the beginning, detectives informed Fugett that it was his choice to come to headquarters and answer questions. At no time was he restrained in any way. He retained freedom to leave the interview room and to use the restroom. In fact, at no time did they assert authority over him or threaten the use of physical force. Finally, at no time did officers deny a request by Fugett either to stop the interview or to allow him to leave. Thus, we reject Fugett's claim that he was in custody from the moment he accompanied the detectives to headquarters for questioning.

Fugett suggests that the coercive atmosphere supports his claim that he was in custody. This argument was rejected in *California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). In *Beheler*, the Court recognized that "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." 463 U.S. at 1124, 103 S.Ct. at 3519 (Citation omitted.). Thus, the Court concluded "a non-custodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a coercive environment." *Id.* Likewise, *Miranda* warnings are not required because the questioning took place at police headquarters. 463 U.S. at 1125, 103 S.Ct. at 3520. Thus, Fugett's coercive atmosphere argument is without merit.

As a final note we would point out that the definition of custodial interrogation focuses on "words and actions on the part of

police." *Watkins v. Commonwealth* 105 S.W.3d 449, 451 (Ky.2003). In this case, Fugett voluntarily left the interview room at approximately 5:25 a.m. and approached a detective to inform him that he had not been fully honest. Prior to structured questioning on this disclosure, detectives gave Fugett his *Miranda* warnings. Having conducted a de novo review on this issue, we conclude the court did not err in denying Fugett's motion to suppress his statements.

### E. Admonishing Jury to Disregard Evidence

■ Fugett's last argument relates to the court's decision to exclude evidence that the victims may have been in possession of a stolen 9mm pistol months prior to the incident. No one disputes the fact that the only guns recovered following the incident were a shotgun and a dark gray or black 9mm pistol.

The shotgun belonged to Steve Davison, a man who had a long-term relationship with Ray's mother. Davison, formerly a licensed firearms dealer, retained many guns, including several 9mm pistols. However, the 9mm pistol recovered from Fields was not owned by Davison. It had been stolen from Anthony Jenkins during a burglary four months prior to the shooting.

Fugett attempted to introduce evidence concerning a third pistol. During trial, a clerk from the Chevron station stated that months before the incident Ray and Robbins had shown him a pistol that they claimed to have stolen. In response to the Commonwealth's objection, Fugett argued the evidence rebutted the Commonwealth's theory that he had brought the stolen 9mm pistol to the drug sale. Initially, the court agreed and allowed Johnson, the clerk, to testify. As the testimony developed, it became apparent that the pistol Johnson

had seen was silver and could not be the one involved in the incident.

The Commonwealth moved the court to reconsider its decision as to admissibility. The Commonwealth argued the evidence lacked the corroborating circumstances required under Kentucky Rule of Evidence (KRE) 804(b)(3). The Commonwealth pointed out that while Johnson claimed he was not a friend of the victims, it appeared that they thought he was. Further, the evidence suggested they were attempting to impress Johnson. Fugett replied that sufficient corroborating circumstances had been shown. Fugett suggested the victims had no reason to lie, that they believed they were talking to a friend, that the disclosure appeared to be spontaneous, and that Ray did not have unlimited access to the guns belonging to Davison.

After considering the arguments, the court concluded corroborating circumstances were absent and it reversed its decision. In addition to the Commonwealth's arguments, the court noted there was no evidence that the gun was actually stolen. Further, the court felt Fugett's argument would have been stronger if Davison had not owned several 9mm pistols. Having found Fugett had failed to satisfy the requirements of KRE 804(b)(3), the court instructed the jury to disregard the evidence.

■ The admissibility of evidence under KRE 804(b)(3) is left to the discretion of the trial court. *See generally United States v. Guillette*, 547 F.2d 743, 754 (2nd Cir.1976). KRE 804(b)(3) creates an exception to the hearsay rule for statements against interest. In the case of statements against penal interest, the rule states that "[a] statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustwor-

thiness of the statement." The burden of establishing the requirements under the rule rests with the proponent of the statement.

This Court, in *Crawley v. Commonwealth*, adopted the broader approach used by the federal rules in evaluating declarations against interest. 568 S.W.2d 927, 931 (Ky.1978). In *Crawley*, this Court, citing to *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), set out four considerations relevant to the trustworthiness of statements under KRE 804(b)(3), including: "(1) the time of declaration and the party to whom made; (2) the existence of corroborating evidence in the case; (3) the extent to which the declaration is really against the declarant's penal interest; [and] (4) the availability of the declarant as a witness." *Id.* As noted in *Guillette*, these factors are not intended to be exhaustive or absolute. 547 F.2d at 754. Thus, the court must consider "the totality of the circumstances, including not only the circumstances surrounding the making of the statement, but also other evidence at trial that corroborates the truth of the statement." *See dissenting opinion in Harrison v. Commonwealth* 858 S.W.2d 172, 180 (Ky.1993).

A review of the record confirms that the trial court applied the appropriate factors when it considered this issue. The court was free to accept the Commonwealth's interpretation. In particular, the court agreed the declarants may have had a

motive to lie, and that they appeared to be bragging. Further, the court pointed out that the surrounding circumstances failed to support Fugett's interpretation. The court noted there was no evidence confirming the pistol shown to Johnson was actually stolen. Finally, the record supported the conclusion that Davison possessed several pistols. Under these circumstances, we cannot say the court abused its discretion when it concluded Fugett had failed to establish the corroborating circumstances required under KRE 804(b)(3).[6]

## IV. Conclusion

Having found the court erred in denying the Appellant's challenge for cause as to Juror 119631, his convictions and sentencing are herby reversed and this matter is remanded for further proceedings consistent herewith.

LAMBERT, C.J., MINTON, NOBLE, and SCHRODER, JJ., concur.
CUNNINGHAM, J., dissents by separate opinion. ABRAMSON, J., not sitting.

Opinion by Justice CUNNINGHAM, concurring in part and dissenting in part.

While I believe the majority has resolved most of Fugett's issues in a logical and appropriate manner, I disagree with the handling of Fugett's claim that the circuit court abused its discretion in failing to grant a motion to strike Juror 119631 for cause. As this issue led the majority to reverse Fugett's conviction, I must dissent.

---

6. Fugett has also argued the court compounded the errors surrounding evidence as to weapons by allowing the Commonwealth to cross-examine Fields concerning her initial statement that Fugett had a pistol in his possession when she drove him to the Clarion Hotel. Fugett argues the Commonwealth was precluded from raising the prior inconsistent statement because they had stipulated Fields made a statement denying the fact that she knew Fugett had a gun when they drove to the scene. We agree with the circuit court's interpretation that the Commonwealth's stipulation simply acknowledged Fields had made a statement inconsistent with her initial statement. As such, we agree the Commonwealth was able to raise the inconsistent statement during cross-examination of Fields. *See* KRE 613.

The majority reasons that when "[c]onsidering *Shane, Stopher, Soto* and *Sholler* together, they support the conclusion that Juror 119631 should have been stricken for cause in this case." *See* slip opinion at 13. I disagree. I believe *Shane* can be distinguished and, thus, does not mandate this result. Further, I believe the reasoning applied by this Court in *Stopher, Soto*, and *Sholler* supports my conclusion that the circuit court did not abuse its discretion in denying the motion to strike Juror 119631 for cause.

In *Shane*, the juror being challenged was an officer employed by the same organization and assigned to the same district as the officers testifying in the case. *See* 243 S.W.3d 336–37, (Ky.2007). Further, the prospective juror personally knew the officers. While the juror in *Shane* stated he did not believe his relationship with the witnesses or his position with the department would affect his ability to be impartial, he did indicate

> he had "an inside point of view"; that he was "absolutely" pro-police; that while "police are just like everybody else" he did not believe they would lie under oath because they took the oath more seriously; and that he would find it more likely that a police officer was telling the truth than a lay witness.

*See* slip opinion at 13, *quoting Shane*, 243 S.W.3d at 337.

When the facts in the case before us are compared to those in *Shane*, I believe the distinction is clear. Juror 119631 was neither a police officer, nor was he employed by the department or working with the officers who testified. Further, unlike the prospective juror in *Shane*, Juror 119631 did not personally know, nor did he have any relationship with the officers who testified. Rather, as acknowledged by the majority, Juror 119631 stated that his wife's second cousin, a former member of the Louisville Police Department, had been acquitted after shooting a suspected drug dealer. Juror 119631 stated that he had a lot of respect for police and the job they do. Rather than firmly asserting a belief that officers would not lie under oath, or that officers took the oath more seriously than lay witnesses, Juror 119631, *in response to leading questions,* agreed more weight should be given to the testimony of a police officer and that police were more credible. This contrasts sharply with the juror in *Shane* who went on to say "he would find it more likely that a police officer was telling the truth than a lay witness." *Id.* at 13, *quoting Shane, supra.*

I also believe these factual distinctions place this case more in line with our reasoning in *Stopher, Soto,* and *Sholler.* In *Sholler v. Commonwealth,* 969 S.W.2d at 706, a retired Secret Service agent was a member of the jury pool. The juror admitted he was very pro-law enforcement and indicated he would give substantial credence to the testimony of police. Further, when asked if all law enforcement officers told the truth, the juror replied, "I don't know, I think so, yeah, I've never experienced one who lied in court." In finding no error in the court's decision to reject a challenge for cause, this Court concluded that the juror's answers did not indicate bias against the defendant, *Id.* at 708–09. *See also Sanders v. Commonwealth,* 801 S.W.2d 665, 670 (Ky.1990) (that a juror was a police officer in the county of the trial and knew several of the testifying officers did not establish bias).

Likewise, in *Soto v. Commonwealth,* 139 S.W.3d at 850, this Court concluded the facts surrounding the prospective jurors did not establish bias against the defendant. We reached this conclusion knowing one juror knew members of the police department, and another juror stating he

might give more weight to the testimony of police over that of a lay witness. In *Stopher v. Commonwealth*, 57 S.W.3d at 797, the prospective juror acknowledged his father had been a police officer. The juror went on to say that he "did not have any preference for police officers and . . . his family connection to the law enforcement profession would in no manner affect his ability to decide the case based on the evidence presented."

In all three of these cases, the prospective jurors' relationships with law enforcement were closer than those present in the case before us. While the juror in *Stopher* indicated that the relationship would not affect his ability to decide the case before him, the other cases involved jurors who indicated they were pro-law enforcement and would give credibility to the testimony of police officers. What distinguishes these cases and the case before us from *Shane* is not only the degree with which the juror expressed these views, but also the fact that the prospective juror simply did not believe a police officer would lie under oath. The prospective juror went further and stated that he believed it was more likely that a police officer was telling the truth than a lay witness. These statements focus directly on the level playing field we sought in *Shane*. This circumstance simply is not present in the case before us, nor did we find it present in *Stopher, Soto,* and *Sholler.*

Further, the majority makes the point that one of the keys to our decision in *Soto* was our conclusion that there were no testimonial inconsistencies between the officers' testimony and that of lay witnesses. I believe this same reasoning applies in Fugett's case. The majority fails to point to any inconsistencies between the testimony of police officers and the testimony of lay witnesses. Fugett has not contested the substance of his changing version of

events: first, as a helpful witness who could assist police; second, as a bystander present at the crime whose only participation was hiding the weapons at the shooter's request; and finally, as a participant in the drug sale who shot in self-defense.

While one witness, Fields, stated at trial that she had not told police Fugett had a pistol when they went to the hotel, this is not a case of the word of police versus the word of a lay witness. Fields' statement, given after receipt of her *Miranda* rights, was recorded on January 28, 2004. Thus, in effect the dispute was between the initial recorded words of Fields and her subsequent testimony at trial. Under these circumstances, as in *Soto, supra,* there are no testimonial inconsistencies between the officers' testimony and the testimony of lay witnesses. This reinforces my conclusion that the answers given by Juror 119631, *in response to leading questions,* that more weight should be given to the testimony of a police officer and that police were more credible, simply did not create an uneven playing field for Fugett.

The majority expresses concern over whether Juror 119631's responses indicate he could not consider mitigating evidence. I disagree. I believe a review of the juror's answers simply indicates his lack of knowledge as to the law concerning aggravating factors and mitigating evidence. Those answers also indicate his surprise that some things, such as age and substance abuse, can be considered as mitigating factors. As this Court noted in *Mabe v. Commonwealth*

> Voir dire examination occurs when a prospective juror quite properly has little or no information about the facts of the case and only the most vague idea about the applicable law. At such time a juror is often presented with the facts in their harshest light and asked if he

could consider imposition of a minimum punishment. Many jurors find it difficult to conceive of minimum punishment when the facts as given suggest only the most severe punishment. Similarly, many citizens are astounded to learn that being under the influence of drugs or alcohol may be considered by them as factors mitigating the punishment which should be imposed. Predictably, when asked whether they believe being under the influence should mitigate punishment, the answer is often in the negative. A per se disqualification is not required merely because a juror does not instantly embrace every legal concept presented during voir dire examination. The test is not whether a juror agrees with the law when it is presented in the most extreme manner. The test is whether, after having heard all of the evidence, the prospective juror can conform his views to the requirements of the law and render a fair and impartial verdict.

884 S.W.2d 668, 671 (Ky.1994).

In the case before us, the circuit court gave examples and asked Juror 119631 if he could consider evidence of mitigation. Juror 119631 indicated he would consider the evidence, but could not say whether he would automatically give a certain penalty if there was mitigating evidence. When the court rephrased the question in terms of being in a group who could take the evidence into consideration, or being in a group who simply would not give it any consideration, Juror 116931 indicated that he would be in the group that could consider everything presented. Further, Juror 119631 indicated that he could consider the full range of penalties. In light of the totality of the juror's answers, I am unable to say the circuit court abused its discretion in denying Fugett's motion to strike

Juror 119631 for cause based on this reason.

As noted by the majority,

Kentucky has long recognized that "a determination as to whether to exclude a juror for cause lies within the sound discretion of the trial court, and unless the action of the trial court is an abuse of discretion or is clearly erroneous, an appellate court will not reverse the trial court's determination." *Pendleton v. Commonwealth*, 83 S.W.3d 522, 527 (Ky. 2002) (Internal quotes and citations omitted.). *See also Soto v. Commonwealth*, 139 S.W.3d 827, 848 (Ky.2004) ("A determination whether to excuse a juror for cause lies within he sound discretion of the trial court and is reviewed only for a clear abuse of discretion.").

*See* slip opinion at 9–10. The majority goes on to recognize that

the decision to exclude a juror for cause is based on the totality of the circumstances, not on a response to any one question. *See Morgan v. Commonwealth*, 189 S.W.3d at 104, *overruled in part on other grounds by Shane v. Commonwealth*, 243 S.W.3d 336 (Ky.2007). This recognizes the duty of the trial court "to evaluate the answers of prospective jurors in context and in light of the juror's knowledge of the facts and understanding of the law." *Stopher*, 57 S.W.3d at 797.

*Id.* It is my belief that the circuit court's decision simply does not amount to an abuse of its discretion. While the possibility exists that any one of us, sitting as a trial judge, may have reached a different conclusion, this is not the standard for review. The fact that this trial judge reached another result after considering the totality of Juror 119631's answers, the forms of the questions asked, and the juror's knowledge of the law at the time,

simply does not amount to reversible error.

I am also seriously concerned that this decision, coupled with our holding in *Shane*, will place too much pressure upon our trial judges when dealing with the very difficult and inexact science of selecting fair jurors. This case will resonate with every trial judge in this state. Judge Abramson struggled with a troublesome issue that is even more prevalent in the rural areas of the state where jurors are more likely to know witnesses and law enforcement personnel involved in a case.

It is not a far fetched notion that many persons hold members of the law enforcement profession to a higher standard than ordinary citizens. If that is the case, these same persons, when serving as jurors, would reasonably be inclined to give more weight to the testimony of law enforcement personnel. Indeed, it would make for a more wholesome and orderly society if the star of our law enforcement cadre shone so brightly that all of us would have more confidence in their word than we would in the word of the rabble and the rude. If fact, there are many who do.

Perhaps an area where this dilemma is most acute concerns lay witnesses with whom prospective jurors are familiar. Again, this is most likely to occur in rural areas of the Commonwealth. It seems to me that to ask a juror to initially give no greater weight to the statements of someone he or she knows, even if remotely, than to a rank stranger defies common sense and the ways of the world. This problem can become a double whammy when jurors are both friends and acquaintances of the sheriff, the leading law enforcement officer in the state, and a witness in the case.

How to deal with these citizen jurors in a way which does not bleed our jury panels dry, and yet balances the interest of the defendant, is not a simple task. This reality brings us back to the current case before us. Trial judges must be given ample leeway and deference in their voir dire of these types of jurors. There must be sufficient give and take so that the judge's determination is not evaluated on one or two comments or answers of the jurors.

For these reasons, I respectfully dissent from the decision reached by the majority and would affirm Fugett's conviction in the Jefferson Circuit Court.