# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: APRIL 29, 2021
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2020-SC-0087-MR

DAWAN Q. MULAZIM          APPELLANT

V.
       ON APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE JULIE MUTH GOODMAN, JUDGE
NO. 15-CR-00592-003

COMMONWEALTH OF KENTUCKY          APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**AFFIRMING IN PART, REVERSING IN PART, AND REMANDING**

Duwan Q. Mulazim appeals his convictions arising out of two 2014 criminal events as to which a jury convicted him of murder, robbery in the first degree, complicity to commit robbery in the first degree, two counts of receiving stolen property under $500, assault in the second degree, and persistent felony offender (PFO) in the first degree, for which he received sentences of life without possibility of parole plus terms of years totaling seventy-six years, consecutive. Mulazim appeals as a matter of right, Ky. Const. § 110(2)(b), raising various claims of error. After careful review, we affirm the Fayette Circuit Court's

judgment as to all issues arising from the guilt phase of the trial, but reverse and remand with respect to the sentence and restitution in the final judgment.[1]

## I.    Factual and Procedural Background

In 2015, Mulazim and Quincinio Canada were indicted on multiple counts arising out of three separate incidents occurring in June and July 2014: robbery at the Quality Inn, June 15; robbery and murder at the Austin City Saloon, June 20; robbery on Second Street, July 16-17.  The crimes and investigations all occurred in Lexington.  In *Mulazim v. Commonwealth*, 600 S.W.3d 183 (Ky. 2020), we set out the facts relating to the first two events:

> On June 15, 2014, Shane Hansford and Mitchell Smith travelled to Lexington, Kentucky, to help set up a booth for a gun show.  The two had a room at the Quality Inn near New Circle Road.  Hansford's girlfriend, Jessica Rutherford, met them for dinner later that evening, and afterwards the three stopped by a liquor store before returning to the Quality Inn.
>
> Sometime around 3:00 a.m., Rutherford stepped outside the hotel room to make a phone call, and Hansford followed her outside to smoke.  Hansford left the door to the room partially open and joined Rutherford in an area that was well lit by surrounding lights from the pool and parking lot.  While the couple were outside, two men appeared from around the corner and approached them.  The men pointed their weapons at Hansford and Rutherford, demanded everything they had and forced them into their hotel room.  Smith heard the commotion and retrieved Hansford's handgun, a .45 caliber Springfield XDS, from the nightstand as he prepared to confront the intruders.  One of the men saw the gun and took it from Smith.

---

[1] As a point of information, we note that the original presiding trial judge was Hon. Pamela Goodwine, who was elected to the Court of Appeals in November 2018. Judge Goodwine was replaced by the Hon. John E. Reynolds, who was appointed by Governor Matthew G. Bevin on March 25, 2019.  Exec. Order 2019-222.  Judge Reynolds presided over the October 2019 trial in this matter.  Judge Reynolds was replaced by the Hon. Julie Muth Goodman following the November 2019 election.

2

The man later identified as Mulazim instructed the three victims to lie face down on the beds while his accomplice, Canada, searched the drawers, Hansford's backpack, and under a mattress. At trial, Hansford testified that prior to leaving the hotel room one of the men looked at the other and said, "come on nephew." When asked which man made that statement, Hansford pointed at Mulazim. He also identified Mulazim as the man that held him at gunpoint, stating there was no doubt in his mind. Prior to trial Hansford identified Mulazim as one of the robbers from a photo lineup. Rutherford could not identify either of the robbers pre-trial, and Smith could not identify Mulazim but made an equivocal identification of Canada, choosing him and another person from the photo lineup.

The men stole Hansford's and Smith's wallets, a phone, the handgun, and a can of tobacco. Both Hansford and Rutherford called 911 separately to report the robbery. Meanwhile, Smith retrieved another handgun that was stored in their hotel room and pursued Mulazim and Canada but could not catch them. Police responded to the hotel where all three victims were visibly shaken. The victims provided descriptions of the suspects that included clothing type and color, hairstyle, and descriptions of the guns they used. The police later met with the victims to obtain spent casings from the stolen handgun and to present photo lineups.

At trial, the Commonwealth presented the testimony of a police detective who obtained Mulazim's and Canada's cell phone records and forensically examined Mulazim's phone. The phones contained text messages in which Mulazim referred to Canada as "nephew" and Canada referred to Mulazim as "unc." The police investigation also revealed that Canada's phone communicated through a cell tower approximately 1700 feet from the Quality Inn minutes before the 911 calls regarding the robbery.

On June 20, 2014, five days after the Quality Inn robbery, Megan Price was celebrating her birthday with her husband, Jonathan Price. The couple and a group of their friends met at Austin City Saloon in Lexington. Megan and Jonathan went outside a little after midnight to wait for their ride and two men approached them. Megan described one of the men as having dreadlocks and the other man as being shorter with short hair and a dark shirt. One of the men held a gun to Jonathan's head and told him to hand over his money, while the other man tugged at Megan's purse as she tried to hand it over. Megan heard a gunshot and fell, realizing she was shot in the leg. As Megan handed the man with dreadlocks her purse, Jonathan punched the

3

other robber and told Megan to run. Jonathan was also shot, and the man with dreadlocks took his wallet as he fell to the ground. Megan required surgery for her gunshot wound and survived, but Jonathan died from his injuries. A surveillance camera from an adjacent business captured the incident, although the quality of the video played at trial was poor. Megan provided a description of the robbers to the police.

Detective Tim Upchurch was assigned to investigate the Quality Inn robbery and he entered the serial number of Hansford's stolen Springfield .45 XDS handgun into a national database for stolen weapons. The Bureau of Alcohol, Tobacco and Firearms later recovered Hansford's stolen handgun during a controlled street transaction with a man named Anthony Frye approximately two and a half months after Jonathan Price's murder. Detective Upchurch learned that police believed the same kind of gun stolen at the Quality Inn may have been used in the Austin City Saloon shooting based on the shell casings from the murder scene. Those casings were later compared with casings fired from the recovered handgun. Based on information received, Mulazim and Canada were developed as suspects for the crimes at both the Quality Inn and the Austin City Saloon.

600 S.W.3d at 187–88.[2]

On July 16, around midnight, Christopher Kemker and Rob Marques had closed premises on Second Street when they were approached by two African American men. One, with dreadlocks, was wearing a blue shirt and hat; the other had short hair and was wearing a yellow shirt and a baseball cap. At gunpoint, Kemker and Marques were forced face down on the ground, although Marques was able to get a good look at one of the robbers. Ultimately, the perpetrators fled on foot with Kemker's and Marques' wallets, keys, an iPad, cellphone and a GPS system.

---

[2] Much of this same evidence was developed in Mulazim's October 2019 retrial which is the subject of this appeal.

As noted, Det. Upchurch testified that shell casings from the Quality Inn were consistent with the gun used at the Austin City Saloon. Detectives were able to find surveillance footage from a liquor store close to the Austin City Saloon in which Mulazim, wearing a New York Yankees cap, was identified in a silver Chevrolet Malibu. The license plate on the car, as seen in the video, was used to confirm the car belonged to Canada's girlfriend.

Detective Robert Wilson investigated the Second Street robbery. From another detective, he learned that Mulazim and Canada fit descriptions given by Kemker and Marques. Det. Wilson presented photo lineups to Marques who identified Canada as one of the perpetrators. Neither Kemker nor Marques were able to identify Mulazim from a photo lineup.

After the Second Street robbery, the property manager at Mulazim's apartment complex observed Mulazim's wife tossing bags into a dumpster. Because the manager thought this an odd occurrence, she had the bags retrieved and found wallets, keys, ID's and credit cards. After the police were called, Sergeant Matthew Silver responded and found personal items belonging to Kemker and Marques. After learning that these two had been victims of a robbery, Sgt. Silver searched other dumpsters at the complex and found a dark navy baseball cap with a Yankees emblem and 9 mm. bullets. Mulazim's DNA was found on the cap.

In June 2015, Mulazim was indicted for Price's murder and eight counts of robbery in the first degree, one count of assault in the second degree, tampering with physical evidence, and PFO in the first degree. Judge

Goodwine severed the Second Street incident from the first two. As a result, in his first trial, Mulazim was convicted of three counts of robbery in the first degree, those at the Quality Inn, the tampering count and PFO in the first degree. The trial court imposed the jury's recommended sentence of 60 years. We affirmed. 600 S.W.3d at 203. The jury was unable to reach a verdict on the counts occurring at the Austin City Saloon as to Mulazim.[3]

While Mulazim's prior appeal was pending, the Commonwealth proceeded to retry Mulazim on the Austin City Saloon counts, and also the Second Street counts. Although Judge Goodwine had severed the two events, Judge Reynolds granted the Commonwealth's motion to rejoin and try them together. As noted, Mulazim was convicted and Judge Goodman imposed the jury's recommended sentence. Mulazim appeals. Further facts as necessary for our analysis will be presented below.

## II.     Analysis

Mulazim raises ten issues in this appeal. We address each in turn.

### A. Rejoinder of the Second Street Robbery.

Mulazim's first argument is that the trial court erred in rejoining the Second Street robbery with the retrial of the Austin City Saloon crimes. Mulazim claims not only was joinder improper but doing so created unfair prejudice. This issue is preserved. We review a trial court's decision to join, or

---

[3] Canada was acquitted of all charges related to the events at Austin City Saloon, but the jury found him guilty of three counts of first-degree robbery at the Quality Inn and of being a first-degree PFO. He received a sentence of fifty years on each count to run concurrently. *Mulazim*, 600 S.W.3d at 188–89.

6

conversely to sever, offenses for an abuse of discretion. *Peacher v. Commonwealth*, 391 S.W.3d 821, 834 (Ky. 2013).

RCr[4] 6.18 provides for joinder of offenses in an indictment "if the offenses are of the same or similar character or are based on the same acts or transactions connected together or constituting parts of a common scheme or plan." RCr 8.31, however, requires separate trial if a defendant "is or will be prejudiced" by joinder for trial.

In *Peacher*, we addressed the interplay between the two rules, focusing on the similar nature of certain crimes, whether they appeared to be a part of a common scheme or plan, and the specific proof involved, but also the prejudice to a defendant inherent in joinder. 391 S.W.3d at 836–37. We also noted the advantage of a joint trial in terms of cost and burden savings to courts, parties, witnesses and victims, "especially [] when the evidence for the separate counts will overlap to a considerable extent." *Id.* at 836. Particularly apt to the instant case is our statement concerning the inherent waste in requiring "the Commonwealth to put on the same proof multiple times, to require witnesses to attend and give the same testimony at different trials, and to require separate juries to consider substantially identical evidence." *Id.*

In *Peacher*, the focus for proper joinder was ultimately the proof presented and whether a nexus between the crimes was shown. Citing several

---

[4] Kentucky Rules of Criminal Procedure.

cases, such as *Parker v. Commonwealth*, 291 S.W.3d 647 (Ky. 2009), and *Debruler v. Commonwealth*, 231 S.W.3d 752 (Ky. 2007), we held,

> the required nexus does not arise simply from the proximity of the alleged crimes in time and space, although proximity is certainly relevant, but rather from a "logical" relationship between them, some indication that they arose one from the other or otherwise in the course of a single act or transaction, or that they both arose as parts of a common scheme or plan.

391 S.W.3d at 837.

In this case, the crimes involved demonstrate that they arose as part of a common plan: two men on foot approach victims late at night, or in the wee hours of the morning, in public outdoor locations, and at gunpoint rob the victims. Severance is required only if joinder would result in "undue prejudice." 391 S.W.3d at 838; *see also Elam v. Commonwealth*, 500 S.W.3d 818, 822 (Ky. 2016) (severance required if joinder would be so prejudicial as to be unfair or unnecessarily or unreasonably hurtful). "[I]n assessing whether joinder resulted in undue prejudice, we have asked, with KRE[5] 404(b) particularly in mind, whether evidence necessary to prove each offense would have been admissible in a separate trial of the other." *Peacher*, 391 S.W.3d at 838 (internal quotations and citations omitted). "If so, then the evidentiary objections to joinder, at least, have been deemed answered." *Id.*

Here, the Commonwealth presented proof against Mulazim developed as a result of investigations into the Quality Inn robbery. Mulazim and Canada were positively identified by the Quality Inn victims. Shell casings from the

---

[5] Kentucky Rules of Evidence.

8

gun stolen by Mulazim, a .45 caliber Springfield XDS, matched a shell casing recovered at the Austin City Saloon. Mulazim, wearing a Yankees cap, was positively identified in surveillance video taken minutes before the Austin City Saloon shootings. Megan Price, the survivor from that crime, provided a general description of the perpetrators that matched that given by the victims of the other two events. Most importantly, the evidence recovered from Mulazim's apartment complex dumpster, which Mulazim's wife threw out, indisputably tied Mulazim to the Second Street robbery (Kemker's and Marques' personal effects) and also linked him to the Austin City Saloon shootings (Yankees cap). Just as evidence of the Quality Inn crimes was properly admissible in the trial of the Austin City Saloon shootings, so too was the evidence of the Second Street crime. Thus, the trial court did not abuse its discretion by joinder of the Second Street offenses.

### B. Failure to Instruct on Lesser-Included Offenses.

Mulazim argues that the trial court erred in failing to instruct on second-degree manslaughter as a lesser-included offense of wanton murder. This issue was preserved by a verbal and written request for the instruction.

We review a trial court's decision not to give a jury instruction for abuse of discretion. *Williams v. Commonwealth*, 178 S.W.3d 491, 498 (Ky. 2005). Abuse of discretion occurs when a trial court's decision is arbitrary, unreasonable, unfair, or unsupported by sound legal principles. *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999) (citation omitted).

9

Under RCr 9.54, a trial court has a duty to instruct the jury on the whole law of the case, including "instructions applicable to every state of the case deducible from or supported to any extent by the testimony." *Hudson v. Commonwealth*, 385 S.W.3d 411, 416 (Ky. 2012) (quoting *Thomas v. Commonwealth*, 170 S.W.3d 343, 349 (Ky. 2005)). A trial court generally must instruct the jury on lesser-included offenses when requested and justified by the evidence. *Wombles v. Commonwealth*, 831 S.W.3d 172, 175 (Ky. 1992). No duty exists to instruct on a theory without evidentiary support. *Hudson*, 385 S.W.3d at 416.

In the indictment, Mulazim and Canada were charged with murder. KRS 507.020. Specifically, it charged these two "committed the offense of Murder when with the intention of promoting or facilitating the commission of the offense, they, acting together, engaged in a conspiracy to commit the offense, or aided, counseled or engaged the other in conduct that led to the death of [Jonathan Price] by shooting him under aggravating circumstances." The trial court provided the jury with appropriate definitions as to "complicity," "intentionally," and "wantonly." It then provided the jury with six possibilities as to murder: Intentional Murder, Complicity to Intentional Murder, Intentional Murder Principal or Complicitor, Wanton Murder, Complicity to Wanton Murder, and Wanton Murder Principal or Complicitor. The instruction for Intentional Murder Principal or Complicitor stated,

> If you believe from the evidence beyond a reasonable doubt that the Defendant, Dawan Qaadir Mulazim, is guilty of Intentional Murder under Instruction No. 2 or Complicity to Intentional Murder

10

under Instruction No. 3, but you are unable to determine from the evidence whether the defendant committed this crime as Principal under Instruction No. 2 or Complicitor under Instruction No. 3, then you will find him guilty of Murder, Principal or Complicitor, under this instruction and so state in your verdict.

The jury found Mulazim guilty under this instruction. Our review of the record is that the trial court properly instructed the jury on the permutations of complicity. As noted in *Neal v. Commonwealth,*

> Conspiracy, as envisioned by the statute governing complicity, does not necessarily require detailed planning and a concomitant lengthy passage of time. All that is required is that the defendants agreed to act in concert to achieve a particular objective and that at least one of them committed that objective. *Commonwealth v. Wolford,* Ky., 4 S.W.3d 534 (1999). There was sufficient evidence of a conspiracy which would lead to a reasonable interpretation that Neal and Strong shot the victim so they could rob him. The instructions were not prejudicial and Neal received a unanimous verdict.

95 S.W.3d 843, 850 (Ky. 2003). Mulazim does not argue that the trial court improperly instructed on complicity, only that he was entitled to the lesser-included instruction on manslaughter in the second degree.

Wanton murder includes as an element that the defendant "wantonly[6] engages in conduct which creates a grave risk of death to another person and

---

[6] KRS 501.020 defines mental states for application in the Kentucky Penal Code. "Wantonly" is defined as follows:

> A person acts wantonly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. . . .

KRS 501.020(3).

thereby causes the death of another person." KRS 507.020(1)(b). By contrast, manslaughter in the second degree occurs when a person "wantonly causes the death of another person[.]" KRS 507.040.

The Commonwealth argues that an armed perpetrator approaching a victim with the intent to rob manifests extreme indifference to the value of human life. It cites *Crane v. Commonwealth*, in which this Court held that the defendant was not entitled to the lesser-included instruction of second-degree manslaughter. 833 S.W.2d 813 (Ky. 1992). In the Court's view, the evidence, a gunshot to the back of a store clerk's head, could only support an inference that the shot was fired intentionally or under circumstances indicating extreme indifference to the value of human life. *Id.* at 817. The Court believed the physical evidence belied the defendant's statement to police that he had just fired his gun in the air.

More recent caselaw interpreting the interplay of KRS 507.020(1)(b) and 507.040, admittedly, supports a requirement that the charge of wanton murder generally requires the lesser-included instruction of manslaughter second-degree. *See Wolford*, 4 S.W.3d at 539–40 (reiterating longstanding rule that with a claim of alibi or circumstantial evidence of the defendant's state of mind when he killed the victim, the trial court appropriately is to "instruct on all degrees of homicide and leave it to the jury to sort out the facts and determine what inferences and conclusions to draw from the evidence[]"); *Brown v. Commonwealth*, 975 S.W.2d 922, 924 (Ky. 1998) (stating "whether wanton conduct demonstrates extreme indifference to human life is a question to be

12

decided by the trier of fact[]"); *see also Rogers v. Commonwealth*, 86 S.W.3d 29, 44–45 (Ky. 2002) (defendant was entitled to lesser-included criminal homicide instructions, including second-degree manslaughter, since defendant's statements permitted reasonable doubts as to his state of mind).  The fact-finder, the jury, thus, is to make the determination, based on evidence presented, as to whether the circumstances manifested an extreme indifference to human life.  *See* Robert G. Lawson & William H. Fortune, *Kentucky Criminal Law* § 8-2(d)(2), at 328–30 (1998) (noting Kentucky Penal Code abolished concept of felony murder, and that participation in a felony which results in a death is a relative rather than a determinative factor).

In *Wolford*, however, this Court also noted that all the cases rejecting entitlement to a manslaughter second-degree instruction involved "either an admission by the defendant or **uncontradicted testimony by an eyewitness with respect to who killed the victim, how and why**."  4 S.W.3d at 538 (emphasis added).  The Court further explained, "when the evidence is entirely circumstantial and only establishes the corpus delicti and other circumstances from which the defendant's connection with the crime might be inferred, the jury should be instructed on all degrees of homicide[.]"  *Id.* at 539.

Mulazim argues that Megan Price did not see her husband being shot, and, therefore, who shot him and why was purely circumstantial.  Our review of her testimony discloses otherwise.  On the Commonwealth's direct examination, Ms. Price testified, as follows:

13

CW: Alright. After, I guess, the man with the dreads took the purse off of you, and then what did you see Jonathan and the other person doing?

MP: Physically fighting.

CW: OK. Could you tell how that started?

MP: No.

CW: OK. And when they were physically fighting, where are they?

MP: They were closer to this truck here. Kind of, you know, beside it . . . in this, . . . in that parking space there [pointing to a parking space in a photograph].

CW: And then when you say "physically fighting," you can have a seat. When you say "physically fighting," what are they doing?

MP: I, . . . I had seen Jonathan get shoved into that truck there.

CW: Into . . .?

MP: That one.

CW: This truck here?

MP: Yes. Into the side of it.

CW: OK. You said you saw him . . . get shoved into it by the other man?

MP: Yes.

CW: Alright. And when you say "shoved," what did you see?

MP: Hit.

CW: Hit? Sorry.

MP: Hit.

CW: Hit?

MP: Yes.

CW: Like punched?

MP: Yes.

CW: Punched by the other person?

MP: Yes.

CW: OK. And then punched, and what then did Jonathan do?

MP: He had fallen, he was hit into the side of . . . he fell into the side of the truck and then fell to the ground.

14

CW: And then what happened?

MP: During this time there were two gunshots. It was all very fast. While the purse was being torn off of my body, was the first gunshot, and as he was pushed into this truck was a second gunshot.

CW: Do you know . . . Do you know who . . . who got shot?

MP: Both of us.

CW: Both of us. Do you know where you got shot?

MP: In my left femur. My left leg.

CW: And do you know where Jonathan got shot?

MP: No.

CW: How did you . . . did you know at that point, when you talk about hearing the gunshots, did you know at that point he had been shot?

MP: No.

CW: Do you know who shot you?

MP: Yes.

CW: Who shot you?

MP: The man with the dreadlocks.

CW: And then you said there was a second shot, you didn't realize Jonathan had been shot. But, do you know who fired the second shot?

MP: Yes.

CW: Who was that?

MP: The man with the short hair and the dark shirt.

CW: OK. And how do you know that.

MP: Because . . . It's hard to explain. I was down on the ground and saw it happen.

CW: Saw the shooting happen?

MP: Mm-hmm [affirmative].

CW: Where was Jonathan when the other man shot?

MP: Lying face down.

Her testimony was NOT that she did not see her husband get shot. Her testimony was that she did not realize initially that he had been shot, but she

15

saw the man with short hair wearing the dark shirt shoot the second shot. As stated in *Wolford*, this testimony provides the evidence of "who killed the victim, how and why." 4 S.W.3d at 538. On cross-examination, Ms. Price conceded that at an earlier time, she told police that she did not know who shot Jonathan. This may be the reason the jury found Mulazim guilty of Murder, Principal or Complicitor, under Instruction No. 4.

As a result, the trial court's ruling in refusing to give an instruction on the lesser-included offense of manslaughter in the second degree was not an abuse of discretion.

### C. *Failure to Strike Certain Jurors.*

Mulazim's third claim relates to the death penalty qualification of six jurors as to whom the trial court denied a motion to strike for cause and whom Mulazim subsequently struck by peremptory challenges.

As an initial matter, we question whether these challenges are preserved for appellate review. In *Exantus v. Commonwealth*, 612 S.W.3d 871 (Ky. 2020), we held that in order to preserve the alleged error that the trial court failed to strike a juror for cause, the defendant must (1) move to strike the juror and be denied; (2) exercise a peremptory strike on that juror *and identify a different juror upon which he would have otherwise used that peremptory strike*; (3) use all his peremptory strikes; and (4) the juror he would have otherwise used a peremptory strike on must sit on the jury. *Id.* at 891–92 (emphasis added) (citing *Gabbard v. Commonwealth*, 297 S.W.3d 844, 854 (Ky. 2009)). While Mulazim moved to strike six jurors for cause, nos. 5213, 5302, 5326,

16

5414, 5448, and 5464, and used his peremptory strikes on them, he only generally listed six different jurors he would have peremptorily struck, nos. 5243, 5389, 5257, 5514, 5313, and 5494 (listed in order by Mulazim). He failed to specify or link one of these different jurors with the juror not struck for cause. Mulazim thereby failed to comply with second preservation requirement listed.

The wisdom of this rule is shown by the fact that of the different jurors, the second list, only three, nos. 5389, 5257 and 5494, sat on the case, found Mulazim guilty and recommended his penalty.[7] Another consideration, as we noted in the first appeal of this case, *Mulazim*, 600 S.W.3d at 195–97, is that Mulazim was granted more peremptory strikes than he was entitled under RCr 9.40. Under this rule, he was entitled to nine peremptory challenges; yet, in this proceeding, the trial court granted the parties twelve peremptory strikes, three more than required. Mulazim, thus, received more benefit than the rule allows.

While the foregoing disposes of Mulazim's voir dire claims, we will briefly discuss the six jurors Mulazim argues should have been struck for cause. RCr 9.36(1) requires the trial court to dismiss a juror for cause "[w]hen there is reasonable ground to believe that prospective juror cannot render a fair and impartial verdict on the evidence[.]" Determining whether a prospective juror

---

[7] Juror nos. 5243 and 5514 were peremptorily struck by the Commonwealth, and juror no. 5313 was eventually selected as one of the alternates and did not deliberate.

17

must be excluded "lies within the sound discretion of the trial court, and unless the action of the trial court is an abuse of discretion or is clearly erroneous, an appellate court will not reverse[.]" *Fugett v. Commonwealth*, 250 S.W.3d 604, 613 (Ky. 2008) (citing *Pendleton v. Commonwealth*, 83 S.W.3d 522, 527 (Ky. 2002)).

As noted, Mulazim argues that the trial court committed reversible error by failing to strike six jurors for cause. As to juror nos. 5213, 5302,[8] 5326, 5414 and 5464, Mulazim contends they each expressed opinions which indicated an unwillingness to consider the lower range of penalties for his crimes, or to consider mitigating evidence. While these jurors admittedly present a "close call," after taking into consideration the "totality of the circumstances" surrounding voir dire, we disagree with Mulazim. *See Fugett*, 250 S.W.3d at 613. In coming to our conclusion, we note that each juror initially expressed no reservations about considering the entire gamut of penalties. Only after being presented with a stark and dire hypothetical regarding a charge for murder and an aggravating circumstance did the jurors display hesitation about the sufficiency of lesser penalties, and the possible impact of relevant mitigating factors. Crucially, when the jurors were given

---

[8] Mulazim also contends that juror no. 5302's friendship with several police officers is grounds for her dismissal. However, as we stated in *Brown v. Commonwealth*, "a close relationship to a police officer does not, standing alone, give rise to a presumptive bias." 313 S.W.3d 577, 597 (Ky. 2010). Since Mulazim provides no other indicators of bias, the claim fails.

18

clarifying information, or asked follow-up questions, each recommitted to their original position.

Our conclusion comports with the decision this Court reached in *Harris v. Commonwealth*, 313 S.W.3d 40 (Ky. 2010). In a factually similar scenario, the *Harris* court reasoned that jurors are not immediately disqualified simply because they favor "severe penalties, so long as he or she can consider the full range of penalties." *Id.* at 46 (citing *Soto v. Commonwealth*, 139 S.W.3d 827, 849 (Ky. 2004)). With regards to mitigating factors, the *Harris* court explained that a defendant is not entitled to individual jurors who, "at the outset . . . view particular mitigating factors as having a mitigating effect." *Id.* at 47. Consequently, when the jurors in *Harris* expressed hesitancy about specific mitigating factors, such as low IQ or abusive childhood, they were not incapable of rendering an impartial verdict when the challenged jurors indicated that their "penalty decision would be based not only on the crime but on its circumstances as well." *Id.* at 48. The key in *Harris*, as in this case, is not simply the jurors' predispositions, but their willingness to reserve judgment until all the evidence has been presented and to comport their decision with the law given.

As to juror no. 5448, Mulazim argues she should have been struck for cause because she evaded his counsel's questions regarding a Facebook post she made about football players kneeling during the national anthem. Specifically, he contends that the combination of her post and the subsequent exchange at voir dire indicated a reasonable potential for racial bias against

19

him. Mulazim's argument is not supported by the evidence. As an initial matter, whether the post existed is unclear. Regardless, the exchange between this juror and counsel was simply not substantive enough to establish an inference of bias. When asked if she followed football, juror no. 5448 expressed a greater interest in baseball, and when asked if there was a legitimate reason for players to kneel she simply stated that she was unsure. Given the circuitous questions and ambiguous answers we cannot conclude that the trial court abused its discretion by retaining juror 5448.

### D. Striking Two Jurors for Cause.

Mulazim next argues that the trial court erred in granting the Commonwealth's motion to strike two jurors, nos. 5023 and 5294, for cause. As with all jury selection determinations, we review the trial court for "abuse of discretion, or [] clearly erroneous" decisions. *Fugett*, 250 S.W.3d at 613 (internal citation and quotation omitted). When determining whether a prospective juror's views on capital punishment merit dismissal, the proper test is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Hunt v. Commonwealth*, 304 S.W.3d 15, 45 (Ky. 2009) (quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)).

Both jurors meet the threshold for dismissal set out in *Hunt*. By stating that they would either ask to be excused from their duty or otherwise dismiss the death penalty out of hand, neither juror exhibited that they would be "willing to consider all of the penalties provided by state law[.]" 304 S.W.3d at

20

45 (quoting *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968)). During voir dire both juror nos. 5023 and 5294 explicitly voiced uncertainty about their duties to consider the death penalty. Juror no. 5023 went so far as to indicate that she would ask to be excused during deliberation if she could not convince her prospective fellow jurors to set aside the death penalty. And juror no. 5294 stated that he would only agree to consider the death penalty if he could still say no, before reading a self-prepared list of qualities he believed qualified him for jury duty. Based, in part, on these responses, the trial court properly dismissed both jurors for cause.

### E. Admission of KRE 404(b) Evidence.

Mulazim's next claim relates to the trial court's admission of KRE 404(b) evidence about the Quality Inn robbery and the tampering with physical evidence charge. This issue is preserved and, similarly to issues regarding jury instructions, we review issues as to the admissibility of evidence under an abuse of discretion standard. *English*, 993 S.W.2d at 945.

KRE 404(b) states, as follows:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:

(1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or

(2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

21

To some extent, this issue has already been addressed in connection with Mulazim's argument as to improper joinder of the Second Street robbery. We agree with the Commonwealth that the evidence from the Quality Inn and the apartment complex dumpster were interrelated: the .45 caliber Springfield XDS stolen from the Quality Inn matched the shell casing at Austin City Saloon. The video surveillance showed Mulazim wearing a Yankees cap minutes before the Austin City Saloon murder/robbery. A Yankees cap with Mulazim's DNA was recovered from the dumpster. These pieces of evidence establish plan and identity (Mulazim specifically) and are inextricably intertwined with other evidence essential to the case within the meaning of KRE 404(b). Mulazim seems to claim that this evidence merely established that two black men committed these crimes. To the contrary, the Commonwealth's evidence was to establish that Mulazim committed the crimes.

Evidence admitted under KRE 404(b) is still subject to analysis under KRE 401, 402 and 403 for relevance, probative value and prejudice. *Bell v. Commonwealth*, 875 S.W.2d 882, 889 (Ky. 1994). Relevant evidence is defined as "evidence having any tendency to make the existence of any fact . . . of consequence . . ." more or less probable. KRE 401. Further, KRE 402 provides that "[a]ll relevant evidence is admissible . . ." unless excluded by constitution, statute or other rules, and irrelevant evidence is inadmissible. And, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of undue prejudice[.]" KRE 403. As noted in *Hall v.*

22

*Commonwealth*, the bar set by KRE 401 and 402 is a low one, since "any evidence that tends to make a fact in consequence more or less probable, even if minimally so[,]" is presumptively admissible. 468 S.W.3d 814, 832 (Ky. 2015). Moreover, "[t]he probative value of evidence is measured by the strength of its tendency to prove one side or the other of a material issue in the case." *Ten Broeck Dupont, Inc. v. Brooks*, 283 S.W.3d 705, 717 (Ky. 2009).

As for the prejudice determination, prejudicial evidence is not prohibited because all evidence is to some extent prejudicial, in the sense of being detrimental to one party's case. *Webb v. Commonwealth*, 387 S.W.3d 319, 328 (Ky. 2012). The proper measurement is whether the evidence's "probative value is substantially outweighed by the danger of undue prejudice[.]" KRE 403. This Court has stated the test another way: is the defendant "unduly prejudiced, *i.e.*, whether the prejudice to him was unnecessary and unreasonable." *Price v. Commonwealth*, 31 S.W.3d 885, 888 (Ky. 2000).

We agree with the Commonwealth that the fact that the gun taken from the Quality Inn, where Mulazim was identified as a perpetrator, was used in the Austin City Saloon murder, less than a week later, made it more probable that Mulazim was present at Austin City. The Quality Inn crimes were therefore highly relevant. The tampering charges, indicating a guilty state of mind, and which were discovered and reported by the apartment complex manager, uncovered both the Yankees cap, also linking Mulazim to Austin City, and Kemker's and Marques' wallets and personal property, linking Mulazim to

23

the Second Street robbery. The Quality Inn robberies were highly probative of the Austin City Saloon perpetrators.

The trial court did not abuse its discretion in the introduction of all the evidence.

### F. *Impeachment of Joy Birch by Telephone Call with Mulazim.*

Mulazim's sixth issue involves his claim that the Commonwealth violated RCr 7.24(1) by failing to disclose, pre-trial, Mulazim's telephone call with Joy Birch. Mulazim's argument is that the trial court's allowing the Commonwealth to play a recording of the call was an abuse of discretion. This issue was preserved by contemporaneous objection at trial. We review the trial court's evidentiary rulings for an abuse of discretion. *English*, 993 S.W.2d at 945.

Birch was Mulazim's alibi witness and claimed she was with Mulazim when he was shown in the surveillance video at the liquor store drive-thru window and stayed with him until approximately 2:00 a.m. On direct examination, Birch denied speaking with Mulazim after that night. On cross-examination, she again denied speaking to Mulazim since that night, and denied speaking with him on September 29, 2019, a little less than a month before trial. The Commonwealth then offered to play an audio recording of a telephone call on that date between Mulazim and Birch. Mulazim objected as the call constituted impeachment evidence the Commonwealth was required to

24

disclose and turn over to the defense.[9]  The trial court overruled the objection and the recording was played.

RCr 7.24(1) requires the Commonwealth, upon written request by the defense, to disclose "any oral ***incriminating statement*** known by the attorney for the Commonwealth to have been ***made by a defendant to any witness***, and to permit the defendant to inspect and copy or photograph any relevant (a) written or recorded statements or confessions *made by the defendant*[.]" (emphasis added).  Mulazim, however, does not argue that the contents of the call incriminated him.  His argument is that the call was used to impeach Birch's testimony and to eviscerate her credibility.  To the extent Mulazim claims the Commonwealth violated RCr 7.24(1) because the telephone call constituted an incriminating statement, that claim is simply untenable.

Arguably, the Commonwealth had an obligation to disclose this telephone call under RCr 7.24(1)(a) as a recorded statement made by Mulazim albeit one which was not incriminating as to him.  Mulazim had filed a Motion for Discovery on July 24, 2015, which covered both "[a]ny and all statements . . . or words spoken by Mr. Mulazim" and "[a]ny . . . audio tapes which . . . are possibly relevant to the impeachment of any witness."  On September 30, 2015, the Commonwealth filed its Discovery Compliance Notice, which included multiple items, stating "Discovery is available until the resolution of this case at https://portal.lexingtonprosecutor.com.  The Notice also provided "the

---

[9] Mulazim's brief and reply brief refer to Birch's testimony from the first trial when the jury failed to reach a verdict.  Obviously, the first trial occurred in 2018 and this phone call was made in September 2019.

25

Commonwealth states that the provided discovery will be supplemented with any and all discoverable and/or exculpatory information that may come into its possession, custody or control prior to any plea or trial in this matter." In *Dixon v. Commonwealth*, 519 S.W.3d 396 (Ky. App. 2017), the Court of Appeals correctly noted "our law indicates that non-exculpatory discovery is a vehicle driven by the defense." *Id.* at 400 (footnote omitted). As a result, Mulazim has the burden of showing that he took advantage of the Commonwealth's portal and that the complained of recording was unavailable. This he fails to allege.

The trial court did not abuse its discretion in permitting it to be played. Mulazim's claim as to the Birch telephone call fails.

### G. Exclusion of Canada's Acquittal from the First Trial.

Mulazim's seventh argument is that the trial court erred in its exclusion of Canada's acquittal from the first trial. This issue is preserved. We review a trial court's decisions on the admission or exclusion of evidence for abuse of discretion. *Muncy v. Commonwealth*, 132 S.W.3d 845, 847 (Ky. 2004).

Mulazim's argument is that proof of Canada's acquittal was essential to Mulazim's defense due to the Commonwealth's theory of the case that Mulazim and Canada participated in the three robberies together - Quality Inn, Austin City Saloon and Second Street. His defense is that since Canada was acquitted in the prior trial, that calls into question the Commonwealth's theory.

The Commonwealth counters that case law supports that introduction of evidence that a co-indictee has already been convicted or acquitted under the indictment is improper. *Norris v. Commonwealth*, 89 S.W.3d 411, 414 (Ky.

26

2002) (citing *Tipton v. Commonwealth*, 640 S.W.2d 818, 820 (Ky. 1982)); *Martin v. Commonwealth*, 477 S.W.2d 506, 508 (Ky. 1972)). We agree with the Commonwealth.

In *Norris*, this court recited the rationale for the rule as being "whether the defendant committed a specific crime is not aided in the slightest by the admission of evidence of the fact that another jury concluded that another defendant had or had not committed the same crime." 89 S.W.3d at 414 (citing *Commonwealth v. Meredith*, 493 Pa. 1, 425 A.2d 334, 337–38 (1981)) (internal quotation and citation omitted).

Mulazim counters by citing *Norris* to support admission of Canada's acquittal as a "curative admission." 89 S.W.3d at 414-15. In *Norris*, the defendant, Ronnie Norris, Sr., was charged with incest against his daughter. *Id.* at 412. His wife had been tried and acquitted of incest against the couple's son. *Id.* During Norris's trial, the Commonwealth had introduced evidence without objection of the charge against the wife. *Id.* at 413. The trial court then denied Norris's proffer of evidence that the wife had been acquitted. *Id.* This Court held that the general rule concerning inadmissibility of conviction or acquittal of a co-indictee's charges did not apply since Norris and his wife had not been indicted on the same charges. *Id.* at 414. We held, however, that because the wife's charges constituted impermissible character evidence, Norris was then entitled to rebut that evidence by proof of her acquittal. *Id.* at 415.

27

Simply put, the concept of "curative admission" is inapplicable to this case. No error in the tender or admission of evidence has occurred which would require "cure." The trial court did not err by excluding evidence of Canada's acquittal.

### H. Length of Mulazim's Sentence.

Mulazim claims that his sentence exceeds the statutorily permitted sentence, since he received a life sentence without possibility of parole and a term of seventy-six years to run consecutively. While this issue is not preserved, we review sentencing errors on appeal irrespective of preservation. RCr 10.26; *Cummings v. Commonwealth*, 226 S.W.3d 62, 66 (Ky. 2006). The Commonwealth concedes the error.

We have interpreted KRS 532.110(1)(c) to prohibit running a sentence for a term of years consecutive with a life sentence. *Winstead v. Commonwealth*, 327 S.W.3d 386, 409 n.56 (Ky. 2010); *Bedell v. Commonwealth*, 870 S.W.2d 779, 783 (Ky. 1993). In addition, that same statute caps consecutive aggregate terms at 70 years. As a result, this matter is remanded to the Fayette Circuit Court for the entry of an amended judgment correcting Mulazim's sentence.

### I. Entitlement to Restitution Hearing.

Mulazim's next contention is that he was entitled to a restitution hearing. The trial court ordered restitution in the amount of $15,242.74. This issue was preserved. The Commonwealth concedes the error. We, therefore, reverse so much of the trial court's final judgment as ordered restitution. On remand,

28

the trial court shall conduct a restitution hearing, as set forth in *Jones v. Commonwealth*, 382 S.W.3d 22, 32 (Ky. 2011).

### J. Cumulative Error.

The final argument advanced is that the errors in this case are not harmless and require reversal, if not individually then cumulatively. *See Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010). Cumulative error occurs when multiple errors occur, which are harmless on their own, but cumulatively render the trial fundamentally unfair and require reversal. *Elery v. Commonwealth*, 368 S.W.3d 78, 100 (Ky. 2012). We have "found cumulative error only where the individual errors themselves were substantial, bordering at least on the prejudicial." *Id.* None of the alleged guilt phase errors meet the requirements of cumulative error.

## III.    Conclusion.

For the reasons stated, the Fayette Circuit Court's judgment is affirmed in part and reversed in part. This matter is remanded to that court for further proceedings consistent with this opinion.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Kayla Danielle Deatherage
Robert Chung-Hua Yang
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Daniel J. Cameron

29

Attorney General of Kentucky

Kristin Leigh Conder
Assistant Attorney General