RENDERED: SEPTEMBER 22, 2022
TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0344-MR

THOMAS SIMPSON                                APPELLANT

ON APPEAL FROM MUHLENBERG CIRCUIT COURT
V.             HONORABLE BRIAN W. WIGGINS, JUDGE
NOS. 2020-CR-00173 & 2020-CR-00318

COMMONWEALTH OF KENTUCKY            APPELLEE

## OPINION OF THE COURT BY JUSTICE VANMETER

## AFFIRMING

Thomas Simpson appeals as a matter of right[1] from the Muhlenberg Circuit Court judgment sentencing him to twenty-years' imprisonment for his convictions of manslaughter second degree (two counts), driving under the influence of controlled substances first offense, and persistent felony offender first degree. On appeal, Simpson raises three claims of error, none of which merit reversal. Accordingly, we affirm his judgment of conviction and sentence.

### I. Facts and Procedural Background

On July 1, 2019, Karen Leach and Linda Embry were travelling along U.S. Route 431. The weather was clear. Simpson was driving in the opposite

---

[1] Ky. Const. § 110(2)(b).

direction. Near South Carrolton, Simpson's vehicle crossed the center line and collided with the sedan driven by Leach. Leach was killed instantly. Embry was fatally injured and died shortly thereafter. Simpson was apparently unharmed.

As part of the investigation, Kentucky State Police ("KSP") troopers obtained a blood sample from Simpson. The results of the blood test found present in Simpson's blood 36 ng/mL of 7-aminoclonazepam, 99 ng/mL of methamphetamine, and 9.5 ng/mL of amphetamine.[2] Simpson was indicted by a Muhlenberg grand jury on two counts of wanton murder, and a single count of driving under the influence of drugs. By subsequent indictment, Simpson was charged with persistent felony offender first degree.

The Commonwealth's theory of the case was that Simpson was impaired as a result of his use of methamphetamine. Simpson's defense was that the collision was a tragic accident due to his vision being diminished by a combination of direct sunlight, bad eyeglasses, and an ill-timed attempt to pull down his minivan's sun visor.

The Commonwealth called the KSP troopers who were present at the scene of the collision. Their testimony will be further described as necessary. The Commonwealth also called Courtney Carver and Dr. Gregory J. Davis to explain the process and meaning of the blood test. Carver, Forensic Scientist Specialist with the Central Forensic Laboratory, testified amphetamine is most

---

[2] Testimony adduced was that the drug tests were accurate to plus or minus 4 ng/mL.

likely a metabolite of methamphetamine when the latter drug is present in an individual's blood. Dr. Davis, Professor and Director of the University of Kentucky's Forensic Consultation Service, testified that the amount of methamphetamine present in Simpson's blood was nearly twice the limit of the therapeutic range. Dr. Davis further opined that individuals with high levels of methamphetamine in their bodies are at a higher risk of erratic driving and that the investigative evidence and toxicology laboratory evidence were consistent with Simpson "being under the influence of a combination of methamphetamine/amphetamine and 7-aminoclonazepam at the time of the collision." Dr. Davis reserved his opinion of whether Simpson was impaired at the time of the accident, drawing a distinction between "intoxication" and "impairment."[3]

After a three-day jury trial, Simpson was found guilty of two counts of manslaughter second degree,[4] of driving under the influence of controlled substances, and of persistent felony offender first degree. The jury recommended Simpson be sentenced to two consecutive terms of ten years, a recommendation that was adopted by the trial court in its judgment. Simpson now appeals from that judgment.

---

[3] In Dr. Davis' opinion, any amount of drugs is equivalent to a person being intoxicated, but that does not equate to impairment.

[4] Manslaughter in the second degree is a lesser offense of wanton murder.

## I. Analysis

Simpson advances three arguments. First, the KSP failed to give Simpson *Miranda*[5] warnings prior to questioning him at the scene and had no probable cause to request a blood draw. Second, the trial court erred in excusing a prospective juror. And, finally, various errors occurred during the Commonwealth's examination of Detective Brandon McPherson. We address these arguments in turn.

### A. *Simpson's Blood Draw and Statements.*

Simpson first claims the trial court erred in denying his motion to suppress the results of the blood draw and the statements he made to McPherson during their interview. Review of a suppression motion involves a two-step process. First, we review the trial court's factual findings, which are conclusive if supported by substantial evidence. *Anderson v. Commonwealth*, 352 S.W.3d 577, 583 (Ky. 2011). Second, we conduct a de novo review of the trial court's conclusions of law. *Id.*; *see also Jackson v. Commonwealth*, 187 S.W.3d 300, 305 (Ky. 2006) ("When reviewing a trial court's denial of a motion to suppress, we utilize a clear error standard of review for factual findings and a *de novo* standard of review for conclusions of law.").

Prior to trial, Simpson moved to suppress any statements he made while at the accident scene as well as the blood draw. Before the trial court, Simpson made much the same argument now before us: that he was in custody when he spoke to the troopers, that he was never read his *Miranda*

---

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

rights, and that officers lacked probable cause to subject him to a blood test. The Commonwealth countered that Simpson was not in custody for purposes of *Miranda*, and that the blood draw was properly obtained either by Simpson's consent or by probable cause under Kentucky's implied consent law.

The Commonwealth called Sergeant Nick Rice, Detective Brandon McPherson, and Trooper Matt Jordan. Rice was the lead officer at the collision scene. Rice explained KSP policy as it relates to fatal accidents.[6] Following the accident, Rice explained that policy to Simpson and requested a blood draw, to which Simpson agreed. Simpson further agreed to a brief interview prior to transport to the hospital. Rice reiterated to Simpson that he was not under arrest and not in custody. Rice described Simpson as "very cooperative" and admitted it was not obvious that Simpson was intoxicated at the scene.

At Rice's direction, McPherson interviewed Simpson, placing him in the passenger seat of an unmarked official vehicle for that purpose. McPherson sat in the driver's seat, with Rice standing near the open passenger-side door.

---

[6] At the suppression hearing, Simpson introduced Kentucky State Police General Order OM-E-1, addressing Traffic Collision Investigations. Pertinent to this case is Section F. Requests for Alcohol/Drug Testing in Fatalities/Felony Charges:

1.  When a collision involves a fatality or there exists the possibility of a driver being charged with a felony as a result of the collision, the investigating officer shall request alcohol/drug testing of all involved drivers.

    a.  If an operator is deceased, the investigating officer shall make the request known to the coroner before removal of the body from the scene, as well as requesting a full autopsy be performed.

    b.  If the investigating officer suspects that any operator is under the influence of any illegal substance and the operator refuses the request of blood or urine testing, the officer shall immediately petition the court for a search warrant.

During the interview, Simpson admitted taking Wellbutrin, a psychological medication, as well as other medications including Lortabs, Xanax and Klonopin. McPherson noted Simpson's pupils were "small and pinpointed" and his eyes were droopy. The only medication Simpson admitted to taking the day of the accident was a muscle relaxer. The interview with Simpson was brief—lasting approximately nine minutes—as the KSP needed to take Simpson to the hospital for the blood draw. McPherson did not perform any field sobriety tests on Simpson but explained that KSP's policy in a fatal accident is to request all involved drivers to submit to a blood draw.

Trooper Jordan testified that he transported Simpson to the hospital for the blood draw. Jordan did not handcuff Simpson before placing him in the cruiser, as was procedure for individuals under arrest. At the hospital, Jordan read Kentucky's implied-consent warning to Simpson, observed the blood test, and drove Simpson back to his home afterwards.

Based on the testimony of the officers, the trial court overruled Simpson's motion, finding that Simpson was not in custody for purposes of *Miranda* and determining that the question of the blood draw's legality turned on the existence of probable cause. In finding the existence of probable cause, the court pointed to the facts that Simpson had just been involved in a major collision, was unsure of his role in that collision, had admitted to taking some medications, and had pinpoint pupils. All these factors, in the trial court's view, supported a finding of probable cause. The trial court accordingly denied Simpson's motion.

*1.*     *Custodial Interrogation.*    As to whether Simpson was in custody such that he needed to be provided with *Miranda* warnings prior to his interview, "the question of 'custody' is reviewed de novo." *Peacher v. Commonwealth*, 391 S.W.3d 821, 846 (Ky. 2013) (citing *Alkabala–Sanchez v. Commonwealth*, 255 S.W.3d 916, 920 (Ky. 2008)).

The Supreme Court "adhere[s] to the view that a person is "seized" only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards." *United States v. Mendenhall*, 446 U.S. 544, 553, (1980).

> Relevant circumstances include the place, time, and duration of the questioning; the questioning's tenor, whether cordial and neutral or harsh and accusatory; the individual's statements; the presence or absence of physical restraints; whether there was a threatening presence of several officers and a display of weapons or physical force; and the extent to which the questioner sought the individual's cooperation or otherwise informed him that he was not under arrest and was free to leave.

*Peacher*, 391 S.W.3d at 846.

We agree with the trial court's conclusion that Simpson was not in custody during his interview with McPherson. The interview was brief, only about nine minutes long, and consisted of McPherson asking Simpson general questions regarding where he lived, what he thought happened, and what medications he was on. The interview occurred with McPherson in the driver's seat of an unmarked SUV, Rice near the open passenger door, and Simpson unrestrained in the passenger seat. McPherson reiterated to Simpson prior to the interview that he was not under arrest nor was he being detained. Only

7

when "a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave" can they be said to have been in custody. *Howes v. Fields*, 565 U.S. 499, 509 (2012). Here, the troopers made clear that Simpson was free to leave at any time and did not otherwise coerce him into remaining by their actions.

Simpson argues that Rice wanted to gather information through the interview about Simpson's actions during the wreck. While this characterization is undoubtedly true, the question "is not whether [Simpson] was interrogated[.] The question, rather, is whether he was in custody at the time. *Miranda* does not forbid non-custodial interrogation." *Peacher*, 391 S.W.3d at 847 (citing *Stansbury v. California*, 511 U.S. 318 (1994)). The fact that the interview occurred in McPherson's official vehicle is similarly not dipositive. *See Oregon v. Mathiason*, 429 U.S. 492 (1977) (*Miranda* warning not required simply because suspect was in station house)*; Peacher*, 391 S.W.3d at 848 (interview not custodial only because suspect did not initiate interview and it occurred in the police station); *Cecil v. Commonwealth*, 297 S.W.3d 12, 15–16 (Ky. 2009) (suspect not in custody at police station where he appeared voluntarily, was told he could leave, and was not under arrest)*; Fugett v. Commonwealth*, 250 S.W.3d 604 (Ky. 2008) (suspect not in custody when transported in back of cruiser without handcuffs and interviewed at station house where he was otherwise free to come and go).

Here, a brief interview transpired in which Simpson was not threatened either explicitly or implicitly, was unrestrained, and told on multiple occasions

8

that he was neither under arrest nor being detained.  Accordingly, Simpson had not been seized such that troopers were required to read *Miranda* rights prior to engaging in the interview.  The trial court was correct in declining to suppress Simpson's statements.

2.    *Blood draw.*    As to whether suppression of the blood test was required in this instance, "the 'principal components' a reviewing court must examine are 'the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause.'" *Commonwealth v. Jones*, 217 S.W.3d 190, 196 (Ky. 2006) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).  The probable cause standard, however, is incapable of strict definition, and "is a flexible, common-sense standard." *Williams v. Commonwealth*, 147 S.W.3d 1, 7 (Ky. 2004).  Furthermore, probable cause "deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Maryland v. Pringle*, 540 U.S. 366, 370-71 (2003) (internal quotation marks and citations omitted).

Simpson argues that KSP lacked the requisite probable cause to request Simpson submit to a blood draw because "KRS[7] 189A.103(1) requires an officer to have reasonable grounds the driver violated KRS 189A.010 before he can seek a blood sample from the driver."  Simpson contends that reasonable

---

[7] Kentucky Revised Statutes.

grounds for the draw needed to exist at the time Rice requested Simpson

submit to the draw.

> KRS 189A.103(1) states that a person
>
> who operates or is in physical control of a motor vehicle or a vehicle that is not a motor vehicle in this Commonwealth . . . has given his or her consent to one (1) or more tests of his or her blood, breath, and urine, or combination thereof, for the purpose of determining alcohol concentration or presence of a substance which may impair one's driving ability, if an officer has reasonable grounds to believe that a violation of KRS 189A.010(1) or 189.520(1) has occurred. . . ."[8]

Simpson appears to believe that this provision means an officer cannot

approach a suspect and request voluntary consent to a blood draw unless the

officer believes a violation has occurred. In support, Simpson cites to *Helton v.*

*Commonwealth*, 299 S.W.3d 555 (Ky. 2009).[9]

In *Helton*, the intoxicated driver drove her van off the road causing the

deaths of four people, her passengers, after the driver struck a tree. After the

accident, while the driver was unconscious in the hospital, sheriff's deputies

visited her and took a blood sample which showed a blood alcohol content of

0.16%. The trial court denied the driver's suppression motion, finding

statutory consent under KRS 189A.103. We reversed the ruling of the trial

---

[8] In *Birchfield v. North Dakota*, 579 U.S. 438, 474 (2016), the Supreme Court held that warrantless blood tests incident to arrest for drunk driving are not permitted under the Fourth Amendment. In *Commonwealth v. McCarthy*, 628 S.W.3d 18 (Ky. 2021), we applied its holding to issues arising under KRS Chapter 189A.

[9] We address Simpson's arguments raised under *Helton*, but following *Birchfield* and *McCarthy*, *supra* n. 8, we conclude that the result in *Helton*, remand to the trial court, would not suffice since a warrant would have been required for the defendant's blood draw. That result does not follow in this case, because as noted *infra*, the KSP pursuant to policy properly requested Simpson submit to a blood draw following a fatal accident, and consent remains a valid exception to the warrant requirement.

court based on "the interplay between the consent provision and the possibility of a refusal to submit to testing by a suspect." *Helton*, 299 S.W.3d at 558. While we acknowledged Helton had impliedly consented to a blood draw pursuant to KRS 189A.103, we held the trial court failed to engage sufficiently in the probable cause analysis necessary to satisfy the statute's "reasonable grounds" requirements and overcome the Fourth Amendment's prohibition on unreasonable search and seizure. *Id.* at 564.

*Helton*, however, simply does not stand for Simpson's proposition that probable cause must exist before a blood draw is requested of a driver. We read the opinion more narrowly since procedurally the *Helton* trial court failed to make findings regarding probable cause so as to bring the blood draw within KRS 189A.103. 299 S.W.3d at 564.

Support for this can be further found in the statutory scheme. KRS 189A.103 does not cover all forms of consent, only *implied* consent. KRS 189A.105(2)(b) addresses situations when officers lack immediate suspicion of a violation of the DUI statutes and explicitly states, "if the incident involves a motor vehicle accident in which there was a fatality, the investigating peace officer shall seek such a search warrant for blood testing **unless the testing has already been done by consent**." (Emphasis added). Clearly the legislature did not intend to create a requirement of probable cause whenever an officer merely seeks *express* consent, as was sought with Simpson. KSP policy, as set forth in its General Order OM-E-1, Section F, thus adheres to the legislative directive as set forth in KRS 189A.105(2)(b). The KSP officers

11

appropriately followed that policy in asking Simpson for consent in the immediate aftermath of a fatal accident.

The Commonwealth argues that the record also supports a finding that Simpson voluntarily consented to the blood draw. The trial court's suppression ruling was limited to the argument Simpson presents to this Court. While the Commonwealth invites this Court to address the voluntariness of Simpson's consent as another basis to affirm the trial court, that issue was not raised by Simpson and is viewed as conceded. As Simpson states in his reply brief, he relies on the issue of whether probable cause existed for police to ask him for a blood test.

### B. Excusing Juror L.M.

Simpson next argues that the trial court erred in excusing juror L.M. for cause. "[W]hether to excuse a juror for cause rests upon the sound discretion of the trial court and on appellate review, we will not reverse the trial court's determination 'unless the action of the trial court is an abuse of discretion or is clearly erroneous.'" *Sturgeon v. Commonwealth*, 521 S.W.3d 189, 192 (Ky. 2017) (quoting *Ordway v. Commonwealth*, 391 S.W.3d 762, 780 (Ky. 2013)).

The right to "an impartial jury is protected by Section 11 of the Kentucky Constitution, as well as the Sixth and Fourteenth Amendments to the [United States] Constitution." *Fugett v. Commonwealth*, 250 S.W.3d 604, 612 (Ky. 2008). The decision to excuse a juror for cause shall be made when the trial court has "reasonable ground to believe that a prospective juror cannot render

12

a fair and impartial verdict on the evidence[.]"  RCr[10] 9.36(1); *Sturgeon*, 521 S.W.3d at 192.  That determination, however, "is based on the totality of the circumstances, [and] not on a response to any one question."  *Fugett*, 250 S.W.3d at 613.  We have in the past cautioned judges that in the event of uncertainty as to "whether a prospective juror should be stricken for cause, the prospective juror should be stricken."  *Ordway*, 391 S.W.3d at 780.

The trial judge struck juror L.M. after the following colloquy sparked concerns about her ability to be impartial:

**L.M.**: My grandfather was convicted of vehicular manslaughter. That was several years ago, but I do remember that and hearing that so I'm a little worried that I may be just slightly impartial[11] to the defendant in that case.

**Judge Wiggins**: I'm sorry, you-

**L.M.**: I'm just a little concerned that I may be slightly impartial just with that case, just with my family history and just knowing that.

**Judge**: Mr. Adams, do you want to question her any about this?

**Prosecutor**: Ma'am, you said that you're gonna be impartial to the Defendant, does that mean that you-

**L.M.**: Not necessarily but I just would have concerns.

**Prosecutor**: Would it be difficult for you to hear this case?

**L.M.**: I believe it may be, yes.

**Prosecutor**: Let me ask you this: I take it from what you said, but you would be more sympathetic to the Defendant?

**L.M.**: Right.

---

[10] Kentucky Rules of Criminal Procedure.

[11] Context suggests juror L.M. meant "partial" as opposed to "impartial."

13

**Prosecutor**: And more likely to find him not guilty? Even if I showed you everything I'd need to show you'd be more likely to find him guilty of a lesser charge than murder?

**L.M.**: Right, the second, just a lesser charge.

**Prosecutor**: And that's because of your-

**L.M.**: Yes, just for that sympathy.

**Prosecutor**: And how long ago was that?

**L.M.**: I wasn't even alive. It was when he was younger and I've only heard stories of it and the situation so I'm not sure-

**Prosecutor**: But obviously it has had some bearing and effect on you and your life.

**L.M.**: Right.

**Prosecutor**: Did he go to prison for that?

**L.M.**: Yes, he did.

**Prosecutor**: Was he outside of your life while in there?

**L.M.**: Right.

**Prosecutor**: Your honor, I don't have any further questions.

**Judge**: Mr. Sherman, do you?

**Defense**: Yes, briefly. Do you think that if the court were to instruct you on the law and you were to sit on the jury and see the facts that you could enter judgment either for or against the Defendant based on the facts and the law only?

**L.M.**: Yes, just with the facts and the law, I could.

**Defense**: Could you put aside your biases and the fact that your grandfather was convicted and sit and make those decisions? I know it would be hard for you.

**L.M.**: It would be.

**Defense**: Could you do it? If instructed to do so, could you do it?

14

**L.M.**: Yes, I think I could, but I do to an extent think that personal judgment judges all of us.

**Judge**: I'm sorry?

**L.M.**: I do think that to an extent that personal experiences kind of lead all of us to a thing. I mean, of course I would try my best, but [trails off].

The trial court elected to strike L.M. "out of an abundance of caution" based upon her experience with her grandfather.

Simpson argues L.M. was improperly excused and that she had shown through her responses to defense counsel's questions that she could put aside her biases and decide the case based upon the law and the facts. However, given the exchange between counsel and L.M., the trial judge did not err in excusing L.M.

L.M.'s hesitancy to approach the trial with an open mind as to possible verdicts was apparent from her statements. She stated clearly that she would be sympathetic to Simpson and that, from the outset, would be more inclined to find for a lesser charge. Defense counsel's attempts at rehabilitation failed to overcome these expressions. "[A] juror might say [s]he can be fair, but disprove that statement by subsequent comments or demeanor so substantially at odds [with her statement of fairness]." *Shane v. Commonwealth*, 243 S.W.3d 336, 338 (Ky. 2007). Here, L.M. indicated she thought she could overcome her biases, but ultimately reiterated her belief that her experience with her grandfather would unavoidably sway her judgment.

15

For these reasons, we find the decision of the trial judge to excuse L.M. for cause was not error.

### C. *Errors during Commonwealth's Examination of Det. McPherson.*

*1.     Prosecutor's question describing victims as "murdered."* Simpson claims the phrasing of a question asked during direct examination of McPherson amounted to prosecutorial misconduct not cured by the trial court's admonition.  During the Commonwealth's questioning of McPherson, the following exchange occurred with regard to Simpson's behavior during his interview with McPherson:

> **Prosecutor**: Did the Defendant exhibit anything normal that you would expect in this case?
>
> **McPherson**: Not at all.
>
> **Prosecutor**: In fact, did he seem to be phased by the fact that he just murdered two people?
>
> **McPherson**: No.

Defense counsel objected as McPherson was responding and the trial judge immediately sustained the objection and called counsel to the bench.  At the bench, defense counsel moved for a mistrial.  The court found the question to be accusing, conclusory, and inappropriate.  However, the court declined to declare a mistrial and instead admonished the jury to disregard the question and not consider it in deliberations.  Simpson asserts the trial court erred in not granting a mistrial.

"On review, we note 'the decision to grant a mistrial is within the sound discretion of the trial court, and such a ruling will not be disturbed absent an

16

abuse of that discretion.'" *Major v. Commonwealth*, 275 S.W.3d 706, 716 (Ky. 2009) (quoting *Woodard v. Commonwealth*, 147 S.W.3d 63, 68 (Ky.2004)). "[T]he trial court, in its discretion, may choose to admonish the jury instead of granting a mistrial; this is so because an admonition is presumed to cure a defect in testimony." *Id.* (citing *Alexander v. Commonwealth*, 862 S.W.2d 856, 859 (Ky.1993)).

> This presumption is only overcome 1) when an overwhelming probability exists that the jury is incapable of following the admonition and a strong likelihood exists that the impermissible evidence would be devastating to the defendant; or 2) when the question was not premised on a factual basis and was inflammatory or highly prejudicial.

*Id.*

The trial court did not abuse its discretion in declining to grant a mistrial. The sole issue upon which Simpson sought a mistrial was the prosecutor's use of the word "murdered" in his question. Certainly, the question was impermissible, and whether the victims were "murdered" or their deaths due to some lesser degree of fault was a question within the sole province of the jury. *Tamme v. Commonwealth*, 973 S.W.2d 13, 32 (Ky. 1998). However, the court's subsequent admonition was sufficient to dispel whatever taint the question created.

The presumption that the admonition was curative cannot be overcome by application of either of the possibilities described in *Major*. The question may well have been prejudicial to the defendant, but not significantly more prejudicial than any of the prosecutor's other questions during the trial. Indeed, the jury could hardly have been inflamed or Simpson highly prejudiced

17

by a question that suggested Simpson had murdered Leach and Embry while the jury sat in judgment of Simpson upon two counts of murder. Given the context of the question, we do not see an "overwhelming probability" the jury could not follow the admonition and we do not believe the question sufficiently prejudicial to warrant the relief Simpson seeks. Furthermore, we note the jury, in fact, found Simpson guilty not of wanton murder but instead the lesser offense of manslaughter second degree. Accordingly, the trial court did not err in denying Simpson's motion for a mistrial.

2. *Mischaracterization of the interview.* Simpson next argues that McPherson's characterization of the interview at the scene was so improper that it was highly prejudicial to his defense. Because defense counsel did not object to McPherson's responses at trial, Simpson requests palpable error review under RCr 10.26.[12] To establish palpable error, an appellant must show "the probability of a different result or error so fundamental as to threaten his entitlement to due process of law." *Brooks v. Commonwealth*, 217 S.W.3d 219, 225 (Ky. 2007) (citation omitted). Such an error "must be 'easily perceptible, plain, obvious and readily noticeable.'" *Burns v. Level*, 957 S.W.2d 218, 222 (Ky. 1997) (citing Black's Law Dictionary (6th ed. 1995)). "It should be so

---

[12] RCr 10.26 states

A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.

18

egregious that it jumps off the page . . . and cries out for relief." *Chavies v. Commonwealth*, 374 S.W.3d 313, 323 (Ky. 2012).

During the trial, the Commonwealth played McPherson's interview with Simpson for the jury. Immediately following, the prosecutor asked McPherson to characterize Simpson's behavior during their interaction:

> **Prosecutor**: How would you describe the Defendant's speech in that video as pressured, rushed, like you spoke of earlier?
>
> **McPherson**: Yes, I would even say excited and, again, erratic. He was kind of everywhere with it, couldn't put together his thoughts with his words.
>
> **Prosecutor**: Is that consistent with—in your training and experience involving narcotics and controlled substances such as methamphetamine—are those actions of his speech, are those indicators that he was impaired on controlled substances like methamphetamine?
>
> **McPherson**: Yes. His actions and speech, and again with my experience in the seventeen years of doing this, when you come across one who is high on methamphetamine or a stimulant or an upper they cannot quit talking.
>
> **Prosecutor**: Could the Defendant quit talking that day?
>
> **McPherson**: No, I was even telling him "you're free to go" and he kept talking and making jokes and just kept going with it. As we all heard.
>
> **Prosecutor**: How would you describe his demeanor?
>
> **McPherson**: [Simpson] didn't care. He was joking and just wasn't bothered. Excited at the same time. He just wasn't bothered at all.
>
> **Prosecutor**: All over the place?
>
> **McPherson**: Yeah, everywhere.
>
> **Prosecutor**: Telling you about his personal life, family history?
>
> **McPherson**: Correct. That I didn't ask about.

Upon review of McPherson's comments, we find no error, let alone an error so fundamental as to threaten Simpson's entitlement to due process of

19

law.  KRE[13] 702 permits a witness not testifying as an expert to opine on matters which are "(a) rationally based on the perception of the witness; (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Here, McPherson provided the jury with testimony about the interview that was based on his perception of Simpson's behavior during that interview, was helpful to understanding how troopers perceived Simpson on the day of the collision and was not based on specialized knowledge.  In short, McPherson's testimony fully comported with KRE 702.

Insofar as Simpson argues that because the case turned on his state of intoxication and McPherson's characterization made it seem more likely that Simpson was intoxicated, we note such testimony is not improper.

> Kentucky law permits witnesses to give opinion testimony regarding a person's apparent intoxication; the apparent age of a person; and a person's apparent mental or emotional state.  The principle connecting each of these cases is that a witness may testify as to a conclusion they drew about a person's behavior from their personal observation of certain facts.

*Carson v. Commonwealth*, 621 S.W.3d 443, 446-47 (Ky. 2021).  *See also Burton v. Commonwealth*, 300 S.W.3d 126, 140 (Ky. 2009) (holding that "[p]olice officers and lay witnesses have long been permitted to testify as to their observations of a defendant's acts, conduct and appearance, and also to give

---

[13] Kentucky Rule of Evidence.

an opinion on the defendant's state of impairment based upon those observations.").

Additionally, Simpson's trial counsel cross-examined McPherson as to other possible causes of Simpson's behavior: other psychological disorders, such as ADHD; recent traumatic events, in this case a car collision and an altercation with members of one victim's family; general nervousness in speaking to police officers; and different people reacting differently to certain circumstances. Whatever truth was to be found in the interview was "left to the rigorous exchange of cross examination, and ultimately the collective decision of the jurors." *Brown v. Commonwealth*, 226 S.W.3d 74, 87 (Ky. 2007) (Cunningham, J., concurring).

McPherson's testimony was undoubtedly prejudicial to Simpson, in the same sense that Simpson was prejudiced by most of the actions of the Commonwealth. *See Ware v. Commonwealth*, 537 S.W.3d 174, 177 (Ky. 1976) ("A defendant is prejudiced, of course, by being tried at all.") (overruled on other grounds by *Jenkins v. Commonwealth*, 496 S.W.3d 435 (Ky. 2016)). However, this prejudice is not of the sort that mandates reversal had it been preserved and reversal certainly is not warranted under palpable error review. McPherson was permitted to testify as to his perceptions of Simpson during the interview and Simpson contested those perception on cross-examination. If those perceptions were harmful to Simpson then that harm is simply the result of the adversarial system working as designed.

21

*3.* *Describing Simpson's behavior as atypical.* Finally, Simpson claims that palpable error occurred when McPherson told the jury that Simpson's behavior after the collision was atypical of others who had been involved in fatal collisions. As with the prior claim of error, this testimony was not objected to during the trial. Accordingly, Simpson seeks review under RCr 10.26. As noted above, "[o]n appellate review, our focus is on whether 'the defect is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process.'" *Huddleston v. Commonwealth,* 542 S.W.3d 237, 245 (Ky. 2018) (quoting *Martin v. Commonwealth,* 207 S.W.3d 1, 5 (Ky. 2006)).

During his testimony on direct examination, McPherson was asked about his prior experience working vehicle collisions:

> **Prosecutor**: Have you worked collisions involving death or injury before?
>
> **McPherson**: Yes.
>
> **Prosecutor**: [Referring to Simpson's behavior during the interview:] Is that the typical reaction of a driver after they've just been in a motor vehicle collision that resulted in serious injuries, much less death?
>
> **McPherson**: Not typical at all. Typically, they're usually concerned about the other driver or if [the other driver] is deceased, they're mournful or, just more grieving than they are excited and cutting jokes up with me.
>
> **Prosecutor**: Did the Defendant exhibit anything normal that you would expect in this case?

22

**McPherson**: Not at all.[14]

Simpson argues that this line of questioning runs afoul of the general rule that prohibits questioning as to the habits of a class of individuals of which the defendant belongs. *Ordway,* 391 S.W.3d at 776-77; *Miller v. Commonwealth,* 77 S.W.3d 566, 572 (Ky, 2002); *Johnson v. Commonwealth,* 885 S.W.2d 951, 953 (Ky. 1994). In *Johnson,* we stated the rationale that "[t]o permit the Commonwealth to cross examine about the habit of a class of individuals [to show] how one unique individual in that class might have acted on a given occasion would invite the jury to arbitrarily hold an individual responsible based on his membership in the class." 885 S.W.2d at 953. In *Orway,* we stated "[w]e do not recognize as legitimate subjects of expert opinion, 'how guilty people typically behave' or 'how innocent people do not act.'" 391 S.W.3d at 776-77. By comparing Simpson's behavior to the behavior of others involved in fatal collisions, Simpson believes the Commonwealth has violated this principle.

If we were reversing this case on other grounds, we would admonish the trial court on retrial that these few questions were irrelevant under *Ordway, Miller* and *Johnson.* Simpson, however, has conceded non-preservation and requested palpable error review. In other words, was this defect so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process? We hold that it does not. Here, the Commonwealth's questioning and

---

[14] The prosecutor then asked the question describing the victims as "murdered" that has already been discussed.

23

McPherson's answers were not the sole proof of intoxication. The case against Simpson involved much more than these short questions and answers, occurring in a three-day trial. Specifically, the drug tests confirmed Simpson's ingestion of methamphetamine and his driving under the influence of controlled substances, which were present at more than therapeutic levels. Thus, and while the comparison of Simpson's behavior to others involved in fatal wrecks was not properly admissible, we hold that it does not rise to the level of palpable error resulting in manifest injustice in this case.

### III. Conclusion

For the foregoing reasons, the judgment of the Muhlenberg Circuit Court is hereby affirmed.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Kathleen K. Schmidt
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Robert Lee Baldridge
Assistant Attorney General

24